**2013-1429**

# United States Court of Appeals
# for the Federal Circuit

NISSIM CORP.,

*Plaintiff-Appellant,*

*v.*

CLEARPLAY, INC.,
MATTHEW JARMAN, and LEE JARMAN,

*Defendants-Appellees.*

*Appeal from the United States District Court for the Southern District of Florida in case no. 04-CV-21140, Senior Judge Paul C. Huck.*

## BRIEF FOR PLAINTIFF-APPELLANT

JOHN C. CAREY
CAREY RODRIGUEZ GREENBERG
O'KEEFE, LLP
1395 Brickell Avenue
Suite 700
Miami, FL 33131
(305) 356-5455

*Counsel for Plaintiff-Appellant*

JULY 29, 2013

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT
*NISSIM CORP. v CLEARPLAY, INC.*, 2013-1429

## CERTIFICATE OF INTEREST

Counsel for the Appellant, Nissim Corp., certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

      Nissim Corp.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      John C. Carey
      Carey Rodriguez Greenberg O'Keefe, LLP


July 29, 2013                                 /s/ John C. Carey
Date                                          John C. Carey
                                                  *Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................ iv

I.    STATEMENT OF RELATED CASES ................................. 1

II.   JURISDICTIONAL STATEMENT ..................................... 1

III.  INTRODUCTION ............................................................... 2

IV.   STATEMENT OF THE ISSUES ......................................... 8

V.    STATEMENT OF THE CASE ............................................. 9

VI.   STATEMENT OF FACTS .................................................. 12

      A. The Parties and the Field of the Inventions ............................. 12

      B. The Infringement Litigation, Settlement and Patent License .................. 15

      C. The Motion to Enforce ..................................................... 17

      D. The Rule 53 Special Master Proceeding ................................. 18

            1. ClearPlay's Testimonial Admissions on Failure to Use the
               CustomPlay Specifications to Determine What to Code as
               Objectionable ........................................................ 20

            2. ClearPlay's Attorney-Argument Admissions on Failure to Use
               the CustomPlay Specifications to Determine What to Code as
               Objectionable ........................................................ 27

      E. The District Court Decision and This Court's Reversal in *Nissim I* ........ 29

      F. The Remand from *Nissim I* and This Court's Reversal in *Nissim II* ........ 31

      G. The Remand from *Nissim II* ............................................. 35

VII.  SUMMARY OF THE ARGUMENT .................................... 35

VIII.  STANDARD OF REVIEW ............................................................36

IX.    ARGUMENT ..........................................................................37

   A. The District Court Erred in Holding That ClearPlay Has No Duty
      to Use the CustomPlay Specifications to Determine What Content
      to Code As Objectionable ...........................................................37

      1.  The Agreement Explicitly Requires ClearPlay to Use the
          CustomPlay Specifications to Determine What Content to Code
          As Objectionable .................................................................38

      2.  Even If ClearPlay's Duty to Use the CustomPlay Specifications
          to Determine What to Code as Objectionable Were Not
          Explicit, It Would Be a Necessary Implication .................................46

   B. The District Court Erroneously Rejected Nissim's Motion to Hold
      That ClearPlay's Withdrawal of the Sample Filters Operated as a
      Concession of Noncompliance as to the Universe of 2,000 Filters
      Represented by the Sample .........................................................49

   C. Resolution of the Issues on Appeal Is Necessary Whether or Not
      Another Remand Is Feasible ........................................................52

X.     CONCLUSION ........................................................................55

ADDENDUM

   Order Denying Motion for Summary Determination ..... JA 000001-000004

   Order Denying Motion for Relief on Remand,
   Withdrawing Jurisdiction and Dismissing Case ............. JA 000006-000007

   United States Patent No. 5,434,678 ................................ JA 000256-000282

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*A.I.C. Trading Corp. v. Susman*,
  40 So. 3d 769 (Fla. Dist. Ct. App. 2010) .............................................. 44

*Apotex, Inc. v. Thompson*,
  347 F.3d 1335 (Fed. Cir. 2003) .......................................................... 52

*B & B Chem. Co. v. U.S. Envtl. Prot. Agency*,
  806 F.2d 987 (11th Cir. 1986) ............................................................ 53

*BP Prods. N. Am., Inc. v. Oakridge at Winegard, Inc.*,
  469 F. Supp. 2d 1128 (M.D. Fla. 2007) ......................................... 36-37

*Christo v. Padgett*,
  223 F.3d 1324 (11th Cir. 2000) .......................................................... 53

*City of Homestead v. Johnson*,
  760 So. 2d 80 (Fla. 2000) ................................................................... 39

*Computer Sales Int'l, Inc. v. State Dep't of Revenue*,
  656 So. 2d 1382 (Fla. Dist. Ct. App. 1995) ....................................... 44

*Dobson v. Hartford Fin. Servs. Group, Inc.*,
  389 F.3d 386 (2d Cir. 2004) ............................................................... 47

*Franzen v. Lacuna Golf Ltd. P'ship*,
  717 So. 2d 1090 (Fla. Dist. Ct. App. 1998) ....................................... 44

*Hilgraeve Corp. v. Symantec Corp.*,
  265 F.3d 1336 (Fed. Cir. 2001) ......................................................... 37

*In re Cambridge Biotech Corp.*,
  186 F.3d 1356 (Fed. Cir. 1999) ......................................................... 37

*In re Nissim Corp.*,
  428 Fed. App'x 981 (Fed. Cir. 2011) ................................................. 10

*Kipp v. Kipp*,
  844 So. 2d 691 (Fla. Dist. Ct. App. 2003) .................................... 46, 48

iv

*Lawler Mfg. Co. v. Bradley Corp.*,
  280 Fed. App'x 951 (Fed. Cir. 2008) ................................................. 37

*Maxcess, Inc. v. Lucent Techs., Inc.*,
  433 F.3d 1337 (11th Cir. 2005) ....................................................... 37

*Mazzoni Farms, Inc. v. E.I. DuPont de Nemours & Co.*,
  761 So. 2d 306 (Fla. 2000) ............................................................. 37

*MedPointe Healthcare, Inc. v. Kozachuk*,
  No. 2009-1500, 2010 WL 1303480 (Fed. Cir. Apr. 6, 2010) ........................... 36

*Murchison v. Grand Cypress Hotel Corp.*,
  13 F.3d 1483 (11th Cir. 1994) ........................................................ 36

*Nissim Corp. v. ClearPlay, Inc.*,
  No. 2009-1327, 374 Fed. App'x 987 (Fed. Cir. 2010) ............................. *passim*

*Nissim Corp. v. ClearPlay, Inc.*,
  No. 2012-1188, 499 Fed. App'x 23 (Fed. Cir. 2012) .............................. *passim*

*Nissim Corp. v. ClearPlay, Inc.*,
  No. 9:08-cv-80535-PCH (S.D. Fla. filed May 20, 2008) ................... 1, 52, 54, 55

*OBS Co. v. Pace Constr. Corp.*,
  558 So. 2d 404 (Fla. 1990) ............................................................ 44

*Paladyne Corp. v. Weindruch*,
  867 So. 2d 630 (Fla. Dist. Ct. App. 2004) ........................................... 39

*RF Del., Inc. v. Pac. Keystone Techs., Inc.*,
  326 F.3d 1255 (Fed. Cir. 2003) ....................................................... 53

*Sacramento Navigation Co. v. Salz*,
  273 U.S. 326 (1927) ................................................................... 47

*Schaefer Fan Co. v. J & D Mfg.*,
  265 F.3d 1282 (Fed. Cir. 2001) ....................................................... 36

*Wakefield v. Church of Scientology of Cal.*,
  938 F.2d 1226 (11th Cir. 1991) ....................................................... 52

v

**Statutes and Other Authorities**

28 U.S.C. § 1295(a)(1) ........................................................................2

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1338(a) ...........................................................................1

11 Richard A. Lord, *Williston on Contracts* § 31:7 (4th ed. 1999) .......................47

13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper,
    *Federal Practice & Procedure* § 3533.2 (3d ed. 2008) .....................................53

## I.    STATEMENT OF RELATED CASES

Two appeals from this action were previously before this Court.  *Nissim Corp. v. ClearPlay, Inc.*, No. 2012-1188, 499 Fed. App'x 23 (Fed. Cir. 2012) (Reyna, J., joined by Newman, J.) (Moore, J., dissenting) ("*Nissim II*"); *Nissim Corp. v. ClearPlay, Inc.*, No. 2009-1327, 374 Fed. App'x 987 (Fed. Cir. 2010) (Moore, J., joined by Gajarsa & Linn, JJ.) ("*Nissim I*").  The following district court case may be directly or indirectly affected by the decision in this appeal and is currently stayed pending this Court's decision:  *Nissim Corp. v. ClearPlay, Inc.*, No. 9:08-cv-80535-PCH (S.D. Fla. filed May 20, 2008) (the "2008 Infringement Case").

## II.    JURISDICTIONAL STATEMENT

Plaintiff-appellant Nissim Corp. ("Nissim") filed this action in May 2004 against defendant-appellee ClearPlay, Inc. ("ClearPlay") for patent infringement and other related claims.  The district court had subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).  In November 2005, the parties entered into a settlement and license agreement (the "Agreement"), and the district court sua sponte retained jurisdiction to enforce the Agreement.  In June 2007, Nissim filed a motion to enforce the Agreement (the "Motion to Enforce"), which the district court granted in part and denied in part.  Nissim appealed, and this Court vacated and remanded.  *Nissim I*, 374 Fed. App'x 987.  On remand, the district court held

1

the action moot.  Nissim appealed, and this Court reversed and remanded.  *Nissim II*, 499 Fed. App'x 23.  On second remand, in an order dated April 29, 2013, the district court denied Nissim's motion for relief on remand and withdrew jurisdiction over enforcement of the Agreement.  This appeal is from that final order ending the second remand.  Nissim timely filed a notice of appeal on May 24, 2013.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## III.  INTRODUCTION

The patents in suit concern technology that, among other things, permits viewers of standard, prerecorded DVD movies automatically and selectively to skip or mute various kinds of content that the viewer might find objectionable.  For each DVD movie, a data file called a "map" or "filter" (the term "filter" has generally been used in this litigation) specifies all the types and locations of potentially objectionable content.  Because the content of each movie is different, each filter is specific to a particular movie; e.g., there is a *Spider-Man 2* filter for the movie *Spider-Man 2*, and a *Wedding Crashers* filter for the movie *Wedding Crashers*.  The viewer loads a filter onto a specially-equipped DVD player (e.g., by insertion of a USB memory stick) and uses a menu screen to express content preferences.  Content inconsistent with those preferences is skipped or muted during playback of the DVD.  Buffering ensures seamless playback for the viewer,

2

presenting a customized version of the movie containing only the type of content that the viewer desires to see.

Viewers are completely dependent on the quality of the filters; true viewer control requires filters that are meticulously, consistently created. Errors, omissions, or inconsistencies in identifying and coding objectionable content expose viewers to content they have deemed unsuitable, which defeats the purpose of the product. This is especially problematic for families seeking to avoid content unsuitable for children. To facilitate consistent and reliable viewer control, Nissim affiliate CustomPlay, LLC ("CustomPlay") developed the CustomPlay Specifications, an elaborate, eighty-page set of instructions for determining what content in a movie constitutes objectionable content and how to code it in movie filters. The CustomPlay Specifications provide for identifying and coding content across twelve categories (e.g., Bigotry, Nudity, Substance Abuse, Violence) and three levels of explicitness (Implied, Explicit, Graphic). Filters created using the CustomPlay Specifications afford a viewer highly customizable control over playback.

By the Agreement, Nissim dropped its patent infringement claims and licensed the patents in suit to ClearPlay. In exchange, ClearPlay committed, inter alia, to use the CustomPlay Specifications to determine what content to code as objectionable, and to create products that comply with the CustomPlay

3

Specifications.  This served Nissim's longstanding goal of making the CustomPlay

Specifications the industry standard for coding objectionable content, just as the

familiar movie ratings (G, PG, PG-13, R) promulgated by the Motion Picture

Association of America became an industry standard.  *See Nissim II*, 499 Fed.

App'x at 24 (stating that the CustomPlay Specifications were developed "to

standardize the creation of 'filters'").

　　ClearPlay, however, violated its duty under the Agreement to use the

CustomPlay Specifications to determine what content to code as objectionable.  Its

products fail to code extensive amounts of objectionable content and do not

remotely comply with the CustomPlay Specifications.  Consequently, viewers are

presented with content they specifically attempt to avoid.  On June 11, 2007, based

on the district court's sua sponte retention of jurisdiction to enforce the terms of

the Agreement, Nissim filed a motion to enforce the Agreement (the "Motion to

Enforce").  The parties agreed that the compliance or noncompliance of a first

group of approximately 2,000 filters would be decided using a representative

sample set of eight filters.

　　The district court, however, misinterpreted the Agreement in a manner that

nullified ClearPlay's duties by allowing ClearPlay to use its own judgment rather

than the CustomPlay Specifications to determine what to code as objectionable.

On appeal, this Court reversed the district court's erroneous contract interpretation

4

and remanded for further enforcement proceedings, with instructions for the district court to hold ClearPlay to the CustomPlay Specifications. *Nissim I*, 374 Fed. App'x 987.

On remand from *Nissim I*, Nissim was again frustrated in its effort to secure enforcement of the Agreement. First, Nissim moved for summary enforcement because ClearPlay, in the prior proceeding, had <u>admitted</u> that it does not even use the CustomPlay Specifications to determine what content to code as objectionable. The district court, however, held as a matter of contract interpretation – i.e., as a matter of law – that ClearPlay has no duty to use the CustomPlay Specifications to determine what content to code as objectionable. Second, when the district court ordered the parties to proceed under the same sample-set procedure adopted by stipulation in the prior proceeding, with eight sample filters representing a group of approximately 2,000 filters, ClearPlay withdrew the eight sample filters (not all 2,000) from the market and moved to dismiss the entire proceeding as moot. The district court granted the motion. In *Nissim II*, this Court reversed the mootness dismissal, and declined to reach the question of contract interpretation on jurisdictional grounds in view of the reversal on mootness. 499 Fed. App'x at 29.

On remand again, Nissim moved for relief based on this Court's statement in *Nissim II* that "[t]he district court might, for example, determine that ClearPlay's withdrawal of the eight samples operated as a concession that all of the filters were

5

noncompliant." *Id.* at 30.  The district court denied the motion without explanation

and sua sponte withdrew jurisdiction over enforcement of the Agreement.[1]

_____

[1] Nissim believes the district court's withdrawal of jurisdiction was an abuse of discretion, but because another remand is unlikely prior to the Agreement's expiration on December 31, 2013, for purely practical reasons Nissim does not appeal that aspect of the district court's order.  Nonetheless, it should be noted that the district court sua sponte retained jurisdiction to enforce the Agreement, thus preventing Nissim from seeking enforcement before any other court.  For six years that witnessed two reversals by this Court, the district court denied Nissim's request for enforcement, while ClearPlay admittedly used its own independent judgment, not the CustomPlay Specifications, to determine what content to code as objectionable.  This Court's remand from *Nissim II* was the last chance for meaningful enforcement before expiration of the Agreement.  And *Nissim II* suggested a couple of possible ways for the district court to proceed, including "determin[ing] that ClearPlay's withdrawal of the eight samples operated as a concession that all of the filters were noncompliant," 499 Fed. App'x at 30, or "select[ing] another representative sample of filters," *id*.  This Court did <u>not</u> suggest that withdrawal of jurisdiction was an option.  To the contrary, the Court gently cautioned:

> Finally, because we read the [district] court's order as relinquishing jurisdiction only over *future* disputes – not over the *current* dispute in the instant case – we do not decide under what circumstances it would be an abuse of discretion for the district court to relinquish the jurisdiction it retained over the settlement agreement in its original order dismissing the patent case, and which it has exercised for the past six years.

*Id.*  On remand, the district court immediately ignored that caution and followed the *Nissim II* <u>dissent's</u> advice that "the court on remand merely needs to restate its decision to relinquish jurisdiction in the *clearest* possible terms."  *Id.* at 32 (Moore, J. dissenting).

For the district court to withdraw jurisdiction after appointing itself the exclusive judicial forum for six years, leaving Nissim to start from scratch despite insufficient time to obtain enforcement in a new proceeding, is a textbook case of abuse of discretion.

This appeal is limited to two interlocutory decisions of the district court, both of which could have collateral consequences in the other pending litigation. (*See infra* Part IX.C.)  First, Nissim appeals the district court's erroneous contract interpretation that ClearPlay has no duty to use the CustomPlay Specifications to determine what content to code as objectionable.  This is purely a question of contract interpretation and a matter of law which this Court reviews de novo.  It is also easily reversed, because the district court's interpretation is contrary to the Agreement, to this Court's decision in *Nissim I*, and to common sense.  Nissim does <u>not</u>, however, seek a ruling in this appeal on the <u>factual</u> question whether ClearPlay indeed failed to use the CustomPlay Specifications in determining what to code as objectionable.  Although Nissim believes the record unambiguously evidences such failure, the district court did not even reach that factual question, having ruled as a matter of contract interpretation that no duty existed.  In this appeal, Nissim simply seeks correction of the district court's erroneous contract interpretation, a purely legal issue.

Second, Nissim appeals the district court's denial of Nissim's motion for relief on remand.  Whether withdrawal of the eight sample filters operated as a concession of noncompliance as to the universe of 2,000 filters is a question of law.  This Court's opinion in *Nissim II* correctly suggested that withdrawal of the

sample indeed operated as a concession as to the universe. 499 Fed. App'x at 30.
The district court's denial of Nissim's motion for relief on remand was erroneous.

This Court should: (1) reverse the district court's erroneous contract
interpretation and hold that ClearPlay indeed has a duty under the Agreement to
use the CustomPlay Specifications to determine what content is objectionable; and
(2) reverse the district court's denial of Nissim's motion for relief on remand and
hold that ClearPlay's withdrawal of the representative-sample filters operated as a
concession of noncompliance as to the universe of filters that the samples were
jointly stipulated to represent.

Because the Agreement may expire before this Court's decision is rendered,
a remand may be futile. However, a decision on the merits of the legal issues
presented remains necessary because the district court's interlocutory decisions,
left uncorrected, could potentially have collateral consequences in the 2008
Infringement Case pending between the parties. (*See infra* Part IX.C.)

## IV.    STATEMENT OF THE ISSUES

1.    Whether the district court erred in determining that ClearPlay has no
duty to use the CustomPlay Specifications to determine what content to code as
objectionable.

2.    Whether the district court erred in denying Nissim's motion for a
ruling that ClearPlay's withdrawal of eight representative-sample filters operated

as a concession of noncompliance as to the universe of filters that the eight samples were jointly stipulated to represent.

## V.    STATEMENT OF THE CASE

In May 2004, Nissim commenced this action by suing ClearPlay for patent infringement, misappropriation of trade secrets and breach of contract. (JA000067.)  The infringement claims were based on United States Patents No. 5,434,678, No. 5,589,945, No. 5,724,472, No. 5,913,013 and No. 6,067,401 (the "Patents in Suit") (JA000210-339).[2]

On November 23, 2005, with trial scheduled for the next business day, the parties entered the Agreement and settled the case.  The Agreement provided ClearPlay with a limited, conditional license to practice the Patents in Suit according to the CustomPlay Specifications.  (JA000418-514.)  Sua sponte, the district court reserved to itself jurisdiction to enforce the Agreement.  (JA000391.)

On June 11, 2007, Nissim filed the Motion to Enforce.  (JA000396-000585.) With the parties' cooperation and consent, the district court appointed a special master under Federal Rule of Civil Procedure 53 to conduct a proceeding and issue a report and recommendation on ClearPlay's compliance with the CustomPlay Specifications.  (JA003567-77.)  By stipulation, the parties agreed that a sample set of eight filters would be used as representative of approximately 2,000 filters at issue in a first phase of the proceeding.  (JA003568-70.)  The special master

---

[2] The Addendum includes a copy of Patent No. 5,434,678, which shares its specification with three other Patents in Suit.

9

recommended denial of the Motion to Enforce (JA006016, JA006040), and the district court ratified and affirmed the report and recommendation, overruled all of Nissim's objections, and denied the Motion to Enforce as to filter noncompliance. (JA006307-11.)[3]

Nissim appealed.  (JA006312-13.)  This Court reversed the contract interpretation underlying the district court's ruling, vacated the judgment and remanded for a new compliance proceeding.  *Nissim I*, 374 Fed. App'x 987.

On remand, Nissim moved for summary enforcement granting the Motion to Enforce, based on the plain language of the Agreement, this Court's holding that the CustomPlay Specifications are the sole standard for measuring compliance, and ClearPlay's admissions that it does not even use the CustomPlay Specifications to determine what content to code as objectionable.  (JA006691-707; JA006921-32.) On September 7, 2010, the district court denied the motion for summary enforcement and ordered a new fact-finding proceeding using the same special master and sample-set procedure as before.  (JA007018-21.)[4]  Nissim moved for reconsideration (JA007022-42; JA007264-74), which the district court denied

---

[3] Separately, the district court granted the Motion to Enforce as to royalty noncompliance and denied the Motion to Enforce as to software-interface noncompliance.  (JA006288-89.)

[4] Nissim objected on various grounds to the district court referral of fact-finding to the same special master and moved to vacate the renewed referral.  (JA007043.) The district court denied the motion to vacate.  (JA007329.)  Nissim petitioned for a writ of mandamus, which this Court denied.  *In re Nissim Corp.*, 428 Fed. App'x 981 (Fed. Cir. 2011).

(JA007329).  The parties stipulated to a schedule for the new proceeding.

(JA007482-88; JA007492-96; JA000063 (showing D.E. 783, paperless order

amending schedule).)  Before the new proceeding could begin, however, ClearPlay

discontinued the eight sample filters (but not the thousands of other filters in

dispute) and moved to dismiss the Motion to Enforce as moot.  (JA007497.)

Nissim opposed the motion.  (JA007547.)  On December 21, 2011, the district

court granted ClearPlay's motion.  (JA007775.)

Nissim appealed again.  (JA007777-78.)  This Court reversed the decision

on mootness, because ClearPlay's withdrawal of the sample filters from the market

neither afforded all the kinds of relief that Nissim had requested, nor afforded

relief on all the filters in dispute, *Nissim II*, 499 Fed. App'x at 27, and because the

district court's decision was "in contravention to *Nissim I*'s mandate," *id.* at 28-29.

The Court declined to reach the question of contract interpretation – whether

ClearPlay has a duty to use the CustomPlay Specifications to determine what

content to code as objectionable – because the decision on mootness rendered the

interlocutory decision on that question non-final.  *Id.* at 29.  Stating that the district

court could hold ClearPlay's withdrawal of the eight sample filters operated as a

concession of noncompliance as to the 2,000 filters represented by the eight, the

Court remanded again for further proceedings.  *Id.* at 30.

On remand from *Nissim II*, Nissim promptly filed a motion asking the

district court to hold, as this Court had explicitly suggested, that ClearPlay's

withdrawal of the eight sample filters operated as a concession of noncompliance as to the 2,000 filters represented by the eight.  (JA0007819-31.)  Before ClearPlay even filed a response to the motion, the district court entered an order denying the motion without explanation and withdrawing jurisdiction over enforcement of the Agreement.  (JA007832-33.)

This appeal followed.

## VI.    STATEMENT OF FACTS

### A.    The Parties and the Field of the Inventions

Nissim holds over thirty patents granted to its CEO and president, Max Abecassis, in the field of video playback control.  The patents are licensed to virtually every major consumer-electronics company for manufacturing DVD players.  (JA000187-89.)

In addition to certain video-playback technologies central to the operation of all DVD players, the inventions include technologies enabling viewers of DVDs to skip or mute objectionable content.  (*See supra* pp. 2-3.)  Viewers can select categories and levels of objectionable content (e.g., Violence–Graphic, Bigotry–Implied, Vulgarity–Explicit), and undesired content is seamlessly skipped or muted during playback.

Nissim's affiliate CustomPlay developed the CustomPlay Specifications to standardize the definition and labeling of objectionable content across three levels

of explicitness for each of twelve different categories.  (JA000434-513.)  As the

magistrate judge once assigned to this case summarized,

> In order to standardize its technology, Nissim developed a set
> of rigid guidelines that divided offensive content into twelve
> separate categories (e.g., blasphemy, bloodshed and nudity) and
> divided each category into three levels of "explicitness" (e.g.,
> implied, explicit and graphic).  Nissim's taxonomic hierarchy,
> which is dubbed the "CustomPlay Specs," spans approximately
> 80 pages and provides examples, clarifications and exceptions
> to the procedure that it uses to catalogue offensive content for
> the purpose of "mapping" DVDs, which allows its customers to
> selectively eliminate particular offensive content in their
> movies.

(JA000860.)  The CustomPlay Specifications permit more than 16 million

permutations of content preferences, affording viewers exceptionally customized

control over playback.

ClearPlay was incorporated in 2000 for the purpose of developing

objectionable-content filtering products.  (JA004850; JA005000-02.)  Aware of

Nissim's pioneering patents, ClearPlay contacted Nissim about obtaining a patent

license, but proceeded to do business without one.  (JA000189-94.)  Thus,

ClearPlay is founded upon willful infringement of Nissim's patents.  ClearPlay's

first products, released in 2001, filtered playback on personal computers.  (*See*

JA000191.)  Nissim warned ClearPlay of infringement.  (JA000191-92.)  In 2004,

ClearPlay cooperated with consumer electronics company Thomson, owner of the

RCA label, to release a DVD player containing ClearPlay-supplied software,

13

which operated in conjunction with ClearPlay-supplied filters. (JA000192-93.)

Nissim sent infringement warnings to Thomson and retailer Wal-Mart, both of

which quickly discontinued their relationships with ClearPlay. (JA000194-95.)

ClearPlay, however, switched to other manufacturers and continued infringing.

(JA000195.)

    In addition to infringing Nissim's patents, the ClearPlay-enabled player and

filters were notoriously inconsistent and unreliable, as described in a *New York

Times* technology review:

> ClearPlay is not objectionable just because it butchers the moviemakers' vision. The much bigger problem is that it does not fulfill its mission: to make otherwise offensive movies appropriate for the whole family.
>
> For starters, its editors are wildly inconsistent. They duly mute every "Oh my God," "You bastard," and "We're gonna have a helluva time" (meaning sex). But they leave intact various examples of crude teen slang and a term for the male anatomy.
>
> . . . .
>
> The second problem is that the editors wield their scissors differently according to their view of the characters' righteousness. When Americans are shot in "Black Hawk Down," the editors carefully omit the bullet's moment of impact. But when Somali gunmen are blown apart, you see the whole twitching, gruesome scene.
>
> . . . .
>
> Pervading the editing is an infuriating literal-mindedness, a squeamishness about sex and language but an astonishing indifference to violence, destruction and pain. In "Terminator 3," for example, a man learning that he has unwittingly triggered the annihilation of

14

> mankind is not allowed to say "Dear God" – but you won't miss a frame of the movie's hyperviolent fight sequences. . . .
>
> . . . .
>
> . . . [T]he evidence suggests that ClearPlay's technology is not intended for families at all.  It's for like-minded adults, specifically those who are offended by bad language and sexual situations but don't mind brutality, destruction and suffering.

(JA005876-77.)

## B.    The Infringement Litigation, Settlement and Patent License

Nissim filed the present patent infringement suit in May 2004.  (JA000067.) Extensive claim construction disputes were all decided in Nissim's favor.  (*See* JA000396-97.)  The parties entered the Agreement and settled the case on November 23, 2005.  (JA000418-514.)  ClearPlay obtained a limited license in exchange for, inter alia, agreeing to adopt the CustomPlay Specifications, which are incorporated into the Agreement as Schedule A and initialed by the parties on every page.  (*Id.*)

Nissim's insistence on compliance with the CustomPlay Specifications advanced Nissim's long-standing goal, known to ClearPlay since 2000 (JA000189-91), to create a uniform, industry-wide standard for defining, identifying, coding, and selecting objectionable content (JA000190-91; JA000194; JA000399-400). *See Nissim II*, 499 Fed. App'x at 24 (stating that the CustomPlay Specifications were developed "to standardize the creation of 'filters'").  Nissim was also concerned that ClearPlay's inconsistent and unreliable filters had given the public a

negative impression of the fledgling technology.  (JA005876-77.)  Without ClearPlay's commitment to the CustomPlay Specifications, Nissim would not have settled its infringement claims or granted a license.  (JA005412; JA000399-400.)

The Agreement plainly requires ClearPlay to use the CustomPlay Specifications to determine what to code as objectionable.  It recognizes that ClearPlay will "appl[y]" the CustomPlay Specifications in making compliant filters (JA00419 (Agreement § 1.4(iii)), requires ClearPlay to "identify" objectionable content "using" the CustomPlay Specifications (*id.* (Agreement § 1.4(i)), licenses ClearPlay to "use" the CustomPlay Specifications to "make" filters (JA000422 (Agreement § 4.3)), provides limited circumstances in which ClearPlay may select to omit coding certain content (JA000423 (Agreement § 4.8)), and explicitly authorizes publicizing that "ClearPlay is adopting" the CustomPlay Specifications (JA000431 (Agreement § 11.4)).

The CustomPlay Specifications, which are part of the Agreement, further establish ClearPlay's obligation to use them to determine what content to code as objectionable.  The CustomPlay Specifications command the content coder (the person creating the filter) to "[i]dentify content depicting" matter defined as objectionable in each category (JA000434-513); they command the content coder "[d]o not code" for matter defined as not within the definitions (*id.*); and they

command the content coder "[c]ode" and "[d]o not code" for various clarifications (*id.*).

ClearPlay had created in excess of 2,000 filters at the time of the Agreement. (JA004998.)  Recognizing the material difference between these pre-Agreement products and the products required to be produced under the Agreement, section 1.3 of the Agreement gave ClearPlay nearly a year before compliance with the CustomPlay Specifications was required.  (JA000418.)

### C.    <u>The Motion to Enforce</u>

In the final order dismissing the infringement suit, the district court sua sponte "retain[ed] jurisdiction solely to enforce the terms of the settlement agreement."  (JA000391.)  When ClearPlay released its post-Agreement products, it was obvious that ClearPlay had disregarded the CustomPlay Specifications when determining what content to code as objectionable.  The filters were littered with failures to code content plainly defined as objectionable under the CustomPlay Specifications.  Among the failures, entire categories – including every category that had no analogue in ClearPlay's pre-Agreement filters – were completely uncoded and therefore unable to be filtered.

On June 11, 2007, Nissim filed the Motion to Enforce, seeking the district court's assistance in compelling ClearPlay to honor the Agreement.  The Motion to Enforce alleges, among other things:

17

28.    These failures of the USB Filters to comport with the CustomPlay Specs are the direct result of ClearPlay's inadequate methodology in creating the USB Filters . . . . [T]he USB Filters are not based on the CustomPlay Specs as required by the Settlement Agreement, but rather on the coding standards used by ClearPlay prior to the Settlement Agreement. . . . .

29.    Accordingly, for those instances where RCA Filters were already in existence (*i.e.*, where ClearPlay had prepared an RCA Filter for a DVD movie prior to the Settlement Agreement), ClearPlay simply copied the data and identifiers from the previous RCA Filters and converted their codes to approximate those of the CustomPlay Specs, rather than actually review the content of movies carefully to identify . . . objectionable content according to the particular requirements of the CustomPlay Specs.  For instances where RCA Filters were <u>not</u> already in existence (*i.e.*, for DVD movies released after the Settlement Agreement), ClearPlay simply utilized the same coding methodology it had utilized prior to the Settlement Agreement in creating RCA Filters, instead of coding according to the particular requirements of the CustomPlay Specs.

(JA000404-05.)

Given the flagrant nature of ClearPlay's noncompliance, the Motion to Enforce anticipated that a one-day evidentiary hearing would suffice.  (JA000412.)

### D.    <u>The Rule 53 Special Master Proceeding</u>

The district court referred the dispute over compliance with the CustomPlay Specifications to a magistrate judge, but when the magistrate judge was reassigned (JA000046 (showing 04/04/2008 docket entry)), the district court and the parties collaborated and appointed a special master under Rule 53 (JA003567-77).  One question that arose was how to deal with the large number of filters at issue.  ClearPlay's failure to follow the CustomPlay Specifications to determine what

18

content to code as objectionable meant that essentially all of its filters were noncompliant – over 2,000 just for the ones with pre-Agreement counterparts, plus thousands more that ClearPlay created for the first time after the Agreement. Nissim proposed using a sample-set procedure. (JA002947.) ClearPlay and the district court agreed. The parties drafted an order appointing the special master under Rule 53 and agreed that the special master would evaluate "a representative sample set of filters" (JA003568), with the result presumptively binding on the universe of filters from which the sample was selected (JA003572-73; JA003576).

The proceeding was divided into two phases. Phase I would address the approximately 2,000 filters with pre-Agreement counterparts. (JA003568.) Phase II would address filters with no pre-Agreement counterparts and made between June 11, 2007 and December 31, 2007. (*Id.*) Eight sample filters were selected for Phase I and six for Phase II. (JA3568-70; JA003573.) Each phase was to have its own hearing and its own report and recommendation. (JA003572; JA003576.) Because the proceeding was designed to test whether ClearPlay's noncompliance was systemic, Nissim selected only half the filters to be evaluated, and ClearPlay selected the other half, even though it was Nissim's enforcement motion.

19

1. **ClearPlay's Testimonial Admissions on Failure to Use the CustomPlay Specifications to Determine What to Code as Objectionable**

The special master proceeding vindicated Nissim's allegations that ClearPlay had merely relabeled the old codes in its pre-Agreement filters and had not followed the CustomPlay Specifications to determine what content to code as objectionable. The eighty-page CustomPlay Specifications required coding of a great deal of content that ClearPlay had not previously coded before the Agreement, including four entirely new categories of content. Yet the post-Agreement filters failed to code an enormous amount of content plainly falling within the CustomPlay Specifications, including the four new categories in their entirety. As a result, all the filters with pre-Agreement counterparts were either exactly or almost exactly the same as the prior versions. Filters without pre-Agreement counterparts were likewise grossly noncompliant with the CustomPlay Specifications. It was self-evident that ClearPlay had not followed the CustomPlay Specifications when deciding what content to code as objectionable.

In the special master proceeding, ClearPlay's own witnesses admitted that ClearPlay continued deciding what content to code as objectionable the same way after the Agreement as before the Agreement. Before the Agreement, ClearPlay had no written specifications or guidelines other than a one-page list of categories, with no levels of explicitness. (JA005013-14.) ClearPlay employees responsible

for deciding what content to code as objectionable, who are called "Filter

Developers," decided what to code as objectionable by making purely ad hoc

judgments about what a reasonable person would find offensive.

ClearPlay testified:

> Q.    . . . .
>
> As a developer of RCA filters at ClearPlay, what tells me what type of content is objectionable?
>
> A.    Yeah, there's a potentially very long answer to that.  In summary, I would say it's based on your experiences.  It's based on just a sensitivity to what you might consider a reasonable person to find objectionable. . . . .
>
> . . . .
>
> The best example is akin to not necessarily the same as but it's like, say, standards that an airplane might use or television program.  It's just all part of just that artistic judgment, not necessarily a science.
>
> Q.    So as a ClearPlay filter developer making filters using the RCA classifications, I'm permitted to identify content objectionable if I would find it objectionable; is that right?
>
> A.    No, that's not exactly right.  It is more of a reasonable person would find objectionable.

(JA005043-44.)

> A.    [I]t's not about necessarily the individuals.  Sensitivity, it's about the sensitivity of a reasonable person. . . .
>
> But an individual brings certainly a sense of these things to the table and there can be reasonable disagreements among us.  But ultimately it's what ClearPlay as a whole

decides upon.  It's what we in the company and specifically filter developers, is they look at a scene as they evaluate it in its context.  Ultimately, in their artistic judgment, if it's found to be objectionable and collectively in our artistic judgment it's found to be objectionable, we would create an event for it.

Again, this isn't a science. . . . But it really is an art as it pertains to our collective sensibilities and how we perceive a reasonable person.

Q.    So the standard that gets applied, if I understand your testimony correct, is what ClearPlay as a company has decided is offensive to a reasonable person?

A.    Yes.  I mean that would be correct.

(JA005052-53.)

. . . . [U]ltimately we try do [sic] our best at determining what a reasonable person might find objectionable.

I know for a fact that it's the same kind of process that is used when an airline version is created or is used when a network television version is created . . . .

(JA005060.)

As ClearPlay's president admitted, the pre-Agreement RCA filters could not possibly have complied with the CustomPlay Specifications, which ClearPlay had not previously seen:

Q.  So you will agree that the RCA filters created prior to the settlement agreement, created prior to you ever even seeing the CustomPlay OC specifications, the RCA filters are not in substantial compliance with the CustomPlay specs?

> A.  RCA filters are not in substantial compliance with the specifications, no.

(JA004999.)

Remarkably, ClearPlay then openly admitted that it makes its post-Agreement filters using the <u>same</u> ad-hoc approach used to make the pre-Agreement RCA filters, and <u>not</u> using the eighty (80) pages of rules, definitions, clarifications, restrictions, and examples in the CustomPlay Specifications.  ClearPlay's admissions are exhaustive.

> Q.    . . . .
>
> You're saying that, in the creation of [DVD player model no.] 007 filters such as those at issue in this proceeding, you don't identify objectionable content using the definitions and rules, et cetera contained in the CustomPlay specifications?
>
> A.    No, we don't.  Obviously, there's going to be overlap in what the CustomPlay specification defines as being objectionable and what we use.  As a reasonable person, as we look at that and understand what a reasonable person would find objectionable, there's going to be overlap there.  But, no, we're not bound by using definitions that are in the OC specification to identify the content that is – that we find or identify as being objectionable.
>
> Q.    So what do you use to identify objectionable content in the process of creating 007 filters?
>
> A.    It's an artistic process.  We use our artistic judgment.  We go in and, as we watch the movie, clearly there are elements within movies that I think there's a general sensitivity towards.  It's the same kind of mind-set that perhaps a television station has when they have a movie and they're thinking we can broadcast this over the air but we might want

to be careful, might want to be sensitive to certain types of content.  Same thing an airline would do when they're preparing a movie to show on their planes.  It's just a general sense of and sensitivity towards different types of content.

And using our artistic judgment, we have developed a feel for what that is.  And it's hard to really try and describe it out and create a list of very strict rules and guidelines.  It's a subjective process.  And it's something that we've developed over time to do that.  So it clearly involves any number of things.  But it's something that – ultimately, we use our artistic judgment as we identify what is objectionable.

(JA005017-19.)

Q.    So you are not required in your opinion to identify content as objectionable based upon what the CustomPlay OC specifications set forth as objectionable content?

A.    Yes, that is correct, that ClearPlay can exercise our rights within this agreement as far as when we determine whether something is or is not objectionable in the context of that movie.

(JA005180.)

Q.    How does ClearPlay determine what is objectionable in creating filters for movies?

A.    As ClearPlay goes through the movies, we use a reasonable person standard and look for content that is generally seen to be objectionable.  And this is a form of process that we have developed over the years.  It is content that your general public may find objectionable.

(JA004947.)  Succinctly, ClearPlay admitted: "The filtering of what we take out is the same."  (JA005407.)

24

The CustomPlay Specifications come into play later, ClearPlay testified, only as a framework for assigning categories and explicitness levels to content that ClearPlay has already independently decided to code as objectionable.

> Q.    . . . .
>
> You say that you do apply the CustomPlay specifications when a code and a level is assigned to a time code, right?
>
> A.    Yeah, after someone has determined if something is objectionable, they describe what it is and those descriptions and that detail are used to assign a category and level.

(JA005237.)

> Q.    [F]or you, the definitions only come into play in the assigning step, not in the identification of the content step?
>
> A.    Yeah, I believe so.  That those definitions relate to assigning a category and level so that when we've identified something that is objectionable, you know, within this framework of this specification that we are very specific and indicate which category it is and which level it's identified with.
>
> . . . .
>
> SPECIAL MASTER: So the way you use the OC specifications is once you, using your artistic judgment and whatever other components you use to determine that this particular segment of a movie is objectionable, you then turn to the 5.5 spec and determine how you are going to categorize it in terms of one of the 36 different categories that we've said exist, three levels, 12 categories and say this particular content is going to be designated as whatever the 5.5 spec says it should be designated as.

THE WITNESS: Yes.

SPECIAL MASTER: But until you look at it and determine this is going to be objectionable content, you have not yet used the 5.5 spec in your decision-making process.

THE WITNESS: Yes, that is accurate.  The 5.5 spec still provides some framework as far as we're not looking for things like for categories that are outside of the specification. But, ultimately that is correct.

(JA005198-200.)

ClearPlay thinks its independent judgment about what content to code as

objectionable trumps not only the definitions contained throughout the 80-page

CustomPlay Specifications, but the great many examples contained in the CustomPlay

Specifications.

SPECIAL MASTER: . . . [W]hat if in the specification, the movie you're watching has a specific example that says hypothetically when Rubin is smoking his cigar in Oceans Eleven, you must code this as implied substance abuse, okay, it says it in black and white there in the specification.

Is it your testimony, your understanding that even though it says it in black and white, this is an example of what you must code as implied substance abuse, that your artistic judgment trumps the black and white of the spec and you can say even though that's a given example in the specs, I can say if I take out every scene of Rubin smoking a cigar, this movie is going to lose its message, no one is going to understand the movie because all the scenes will be taken out where they are planning the robbery of these three casinos that's never been done before?

26

THE WITNESS: Yes.

. . . .

BY MR. CAREY:

Q.    My question is if the CustomPlay specs have a specific example that says code Rubin for implied smoking, when your filter developers are identifying the events to be filtered in Oceans Eleven, are you taking that instruction into account or not?

. . . .

Q.    I'm asking about what you do, what you actually do?

A.    I was answering your question. So, if there was a specific example that said Rubin -- if Rubin is holding a cigarette, you must code that, we do not think that we are bound by that example.  We do not think that that means we must go in and identify that as being objectionable.

That is not the case. We do not think that.  We go in and evaluate what's happening and we use our artistic judgment to identify if something is objectionable.

(JA005229-31.)

**2.    ClearPlay's Attorney-Argument Admissions on Failure to Use the CustomPlay Specifications to Determine What to Code as Objectionable**

In defending the special master's report and recommendation, ClearPlay's

attorneys reiterated the testimonial admissions:

ClearPlay does not mechanically apply Version 5.5. Rather, much like airlines and public television stations, ClearPlay uses a reasonable person standard to determine what may be objectionable. . . .

27

> When evaluating potentially objectionable content, ClearPlay uses its artistic judgment to determine whether the degree of offensiveness of the material is outweighed by its importance to the movie. If, in its artistic judgment, ClearPlay determines content should be coded, it uses the levels and categories standardized by Version 5.5.

(JA005972-73.) ClearPlay's attorneys argued that the Agreement requires nothing more:

- "[T]he Special Master correctly concluded that the phrase 'flexibility of artistic judgment' grants ClearPlay discretion when coding, including the discretion of *whether* to code potentially objectionable material in light of its importance and context in a movie." (JA005981.)

- "Nissim . . . vested ClearPlay with flexibility to consider the context, plot, viewer, and type of movie in making a subjective determination about what content is objectionable." (JA005983.)

- "ClearPlay . . . retains the flexibility to decide what is objectionable and whether it should be coded based on its artistic judgment." (JA005984.)

On appeal before this Court, ClearPlay repeated the same admissions:

- "In creating filters, ClearPlay uses its artistic judgment to weigh the potential offensiveness of specific content against its importance to the movie." (JA006711.)

- "ClearPlay filter developers . . . used independent artistic judgment to weigh [content's] objectionableness and importance . . . ." (JA006712.)

- "ClearPlay does not mechanically apply [the CustomPlay Specifications]. Rather, much like airlines and public television stations, ClearPlay uses a reasonable person standard to determine what may be objectionable." (*Id.*)

- "When evaluating potentially objectionable content, ClearPlay uses artistic judgment to determine whether the offensiveness of the material is outweighed by its importance to the movie. When ClearPlay determines content should be coded, it uses the levels and categories in the [Specifications]."  (*Id.*)

### E.    The District Court Decision and This Court's Reversal in *Nissim I*

The special master recommended denial of the Motion to Enforce with respect to compliance with the CustomPlay Specifications (JA006016, JA006040), and the district court "ratified and affirmed" the special master's recommendation (JA006311).  But neither the special master nor the district court actually made findings on whether ClearPlay's post-Agreement filters complied with the CustomPlay Specifications.  Rather, the district court adopted the special master's recommendation that the Agreement allows ClearPlay to "deviate from the definitions of the CustomPlay Specifications if, in ClearPlay's artistic judgment, the objectionableness of the material is outweighed by the material's relevance to the film" (JA006309), and "to decide not to code content . . . when such content is essential to the understanding or appreciation of a movie, as determined by ClearPlay's reasonable artistic judgment" (*id.*).[5]

On appeal, this Court vacated the district court's decision.  The Court held that "[t]he Specifications are the standard against which the substantial compliance

---

[5] The district court also "withdr[ew] its retention of jurisdiction to enforce the terms of the settlement agreement to the extent that any future motion to enforce relates to the compliance of any ClearPlay filters" (JA006311), and the parties withdrew Phase II without prejudice pending appeal (*id.*).

of ClearPlay's OC maps must be measured according to the plain language of the

Agreement." *Nissim I*, 374 Fed. App'x at 991. The Court rejected ClearPlay's

artistic-judgment argument:

> The problem with ClearPlay's definition of Paragraph 1.4 is that
> under its interpretation the artistic judgment exception would
> swallow the substantial compliance rule. The rule is substantial
> compliance – the Agreement makes that much clear. Whether
> there is substantial compliance is for the fact finder to
> determine on a case-by-case basis. . . . [E]xercise of artistic
> judgment is only allowed "within the overall goal of
> maintaining consistency." Nissim argues that it was paramount
> to the successful development of its standard that consistency in
> application exists, and points out that the most frequent
> consumer criticism of ClearPlay's prior filtering products was a
> lack of consistent application. When a user opts for exclusion
> of certain types of content, the user must be able to rely upon
> the filter to actually filter out that content. If a user chooses to
> edit all violence from an inherently violent movie such as *The
> Last Samurai* or *The Postman,* the user may not be able to
> understand the plot or even know who prevailed in the end. But
> that is the choice of the user. Neither the CustomPlay
> Specifications, nor Paragraph 1.4, indicate that ClearPlay can
> deviate from the Specification whenever it determines that the
> objectionable material is too important to plot line or movie
> relevance. ClearPlay's proposed construction would effectively
> allow 0% compliance to be "substantial compliance" so long as
> the decisions not to code were each based on ClearPlay's
> determination that objectionableness was outweighed by the
> material's relevance. We conclude that this cannot be the
> correct construction.

*Id.* at 992-93.

This Court ordered: "We vacate the order of the district court and remand for

the fact finder to determine whether ClearPlay's OC maps substantially comply

with the Specifications in a manner consistent with this opinion." 374 Fed. App'x

at 994.

### F.    The Remand from *Nissim I* and This Court's Reversal in *Nissim II*

ClearPlay's then-attorneys (its third set) immediately moved to withdraw

from representation after this Court's decision in *Nissim I.*  (JA006648-52.)

Remand proceedings were put on hold for months while the district court allowed

ClearPlay to conduct a nationwide search to find a new, fourth set of attorneys.

(JA006653-54; JA006689-90.)  Notably, the fourth set of attorneys has since

withdrawn, and current counsel is ClearPlay's fifth.

After the fourth set of attorneys appeared and the district court allowed the

case to proceed, Nissim filed a motion for summary enforcement based on sections

1.4(i), 1.4(iii), 4.3, 4.8, 11.4, the CustomPlay Specifications, this Court's decision,

and ClearPlay's exhaustive admissions that it does not use the CustomPlay

Specifications to determine what content to code as objectionable.  (JA006691-

707; JA006921-32.)  The motion asked the district court to require ClearPlay to

use the CustomPlay Specifications to determine what to code as objectionable.

The district court denied Nissim's motion for summary enforcement,

holding that ClearPlay had no duty to use the CustomPlay Specifications to

determine what content to code as objectionable:

The fundamental dispute here seems to be about whether the Agreement requires ClearPlay (1) to use a specific process or methodology to determine what to code as objectionable content (i.e., use the Specifications in the process of deciding what to code as objectionable content when creating its filters); or (2) to reach a specific result with its objectionable content maps (i.e., objectionable content filters that are in "substantial compliance" with the Specifications). ClearPlay seems to argue the latter. Nissim, however, argues the former – that there is a systemic, methodological compliance failure.

The Court disagrees with Nissim. Paragraph 1.4 states that a ClearPlay CustomPlay OC Map "shall be in substantial compliance with the CustomPlay Specifications." This requires that ClearPlay's filters—not necessarily its methodology—be in substantial compliance with the Specifications. Of course, if ClearPlay uses its own independent judgment instead of the Specifications when deciding what to code as objectionable content, its filters are less likely to be in substantial compliance. In light of the Federal Circuit's ruling, it would be logical for ClearPlay to use the Specifications to decide what to code as objectionable content. But the test for whether ClearPlay's filters are compliant is whether ClearPlay gets to the right result, not how it gets there. In other words, the proof of the pudding is in the eating.

(JA000003.)[6]

The district court ordered a new special master proceeding, using the same

sample-set procedure as before. (JA007021.) At the district court's direction, the

parties and the special master negotiated a new schedule for the remand

---

[6] The district court's order seems to suggest that only ClearPlay views the Agreement as requiring that the resulting filters comply with the CustomPlay Specifications. Nissim of course has always asserted that the Agreement imposes both a duty to use the CustomPlay Specifications to determine what to code as objectionable, and a duty to produce compliant filters.

proceeding, which the district court entered as an order.  (JA007482-88.)  The

schedule maintained the sample-set approach as ordered by the district court.

(JA007021; JA007483.)  On October 7, 2011, in accordance with the schedule,

Nissim served on ClearPlay a chart listing 794 alleged coding failures in the eight

sample Phase I filters – an average of nearly 100 failures per movie filter.

(JA007681-722.)  ClearPlay then served on Nissim an amended version of the

chart, stating ClearPlay's position on each failure.  ClearPlay conceded 204 of the

794 coding failures (over 25%) and gave no justification for the rest.  (JA007724-

64.)

Simultaneously with serving the amended chart, ClearPlay sent a letter to the

special master in an attempt to scuttle the entire proceeding.  (JA007510-11.)

ClearPlay questioned the legitimacy of the whole five-year course of trial and

appellate litigation.  (JA007511.)  ClearPlay tried to curry the special master's

sympathy over the need for ClearPlay to "spend half a million dollars" on the

proceeding (*id.*), without mentioning that ClearPlay had contingency-fee counsel.

ClearPlay complained about the jointly stipulated schedule.  (JA007510-11.)

ClearPlay misrepresented the chart that Nissim had served, stating that the alleged

violations were "substantially less in number" than in the prior proceeding

(JA007511), without stating the actual numbers (794 versus 811) (*see* JA007513-

15).  The special master had no authority to address any of these matters and instructed ClearPlay to take its complaints to the district court.

ClearPlay then announced that it was withdrawing the eight sample-set filters (but not the universe of 2,000) from the market and filed a motion with the district court to dismiss the action as moot.  (JA007497; JA007519-20.)  Nissim filed a response in opposition, to which ClearPlay did not reply.  (JA007547.)  On December 21, 2011, the district court granted ClearPlay's motion.  (JA007775.)

Nissim appealed to this Court, which again reversed.  The Court held that the case was not moot, because Nissim had sought relief, including injunctive relief, that ClearPlay's withdrawal did not tender; because Nissim had sought relief on all filters, not just the eight sample filters; and because the district court's decision contravened *Nissim I*'s mandate.  *Nissim II*, 499 Fed. App'x at 27-29.  In remanding, the Court suggested that the district court could either proceed again with a sample-set proceeding or could simply "determine that ClearPlay's withdrawal of the eight samples operated as a concession that all of the filters were noncompliant."  *Id.* at 30.  Because the case was not moot, the Court held it lacked jurisdiction to reach Nissim's appeal of the district court's interlocutory contract interpretation that ClearPlay has no duty to use the CustomPlay Specifications to determine what content to code as objectionable.  *Id.* at 29.

G.    **The Remand from *Nissim II***

On remand from *Nissim II*, in accordance with this Court's suggestion, Nissim moved for relief on the ground that ClearPlay's withdrawal of the eight sample-set filters operated as a concession of noncompliance as to all the filters represented by the eight.  The district court, however, denied the motion without explanation and withdrew jurisdiction over enforcement of the Agreement. (JA000006-07.)

## VII.  SUMMARY OF THE ARGUMENT

The district court erred in its interlocutory contract-interpretation ruling that ClearPlay has no duty to use the CustomPlay Specifications to determine what content to code as objectionable in making filters under the Agreement.  The district court's explanation – that the Agreement requires ClearPlay's filters to substantially comply with the CustomPlay Specifications, but does not require ClearPlay to use those specifications to determine what to code as objectionable when creating the filters – makes no sense.  The filters consist entirely of objectionable-content codes and cannot properly be made without using the CustomPlay Specifications.  The Agreement explicitly and necessarily requires both that ClearPlay's filters comply with the CustomPlay Specifications and that ClearPlay use those specifications to determine what to code as objectionable. This Court should reverse the district court's erroneous contract interpretation.

The district court also erred in denying Nissim's motion for relief on remand from *Nissim II*.  As a matter of law, and as this Court's opinion in *Nissim II* correctly observes, 499 Fed. App'x at 30, ClearPlay's withdrawal of the eight sample-set filters operated as a concession of noncompliance as to the universe of 2,000 filters represented by the eight sample filters.  This Court should reverse the district court's denial of the motion for relief on remand, and hold that ClearPlay's withdrawal of the eight sample filters operated as a concession of noncompliance as to the universe of 2,000 filters that the sample filters represented.

## VIII.  STANDARD OF REVIEW

"This court reviews a decision to enforce a settlement agreement . . . under the law of the appropriate regional circuit."  *MedPointe Healthcare, Inc. v. Kozachuk*, No. 2009-1500, 2010 WL 1303480, at *2 (Fed. Cir. Apr. 6, 2010) (citing *Schaefer Fan Co. v. J & D Mfg.*, 265 F.3d 1282, 1288 (Fed. Cir. 2001)). The standards for enforcing settlement agreements are uniform across the regional circuits, including the Eleventh Circuit, and call for summary enforcement on undisputed matters.  *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir. 1994) (citing cases and recognizing "the authority of a trial court to summarily enforce a settlement agreement").

"Settlement agreements in Florida are interpreted and governed by the law of contracts."  *BP Prods. N. Am., Inc. v. Oakridge at Winegard, Inc.*, 469 F. Supp.

36

2d 1128, 1132 (M.D. Fla. 2007). Contract interpretation is a legal issue reviewed de novo on appeal. *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1369 (Fed. Cir. 1999). This Court "review[s] the construction of a license agreement without deference and interpret[s] the licensing agreement under the law governing the agreement," *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed. Cir. 2001), as determined by "the law of the regional circuit from which the appeal arises," *Lawler Mfg. Co. v. Bradley Corp.*, 280 Fed. App'x 951, 954 (Fed. Cir. 2008). The Eleventh Circuit looks to the choice-of-law rules of the forum state to determine applicable law. *Maxcess, Inc. v. Lucent Techs., Inc.,* 433 F.3d 1337, 1341 (11th Cir. 2005). The forum state in this case is Florida, where "courts will enforce 'choice-of-law provisions unless the law of the chosen forum contravenes strong public policy.'" *Id.* (quoting *Mazzoni Farms, Inc. v. E.I. DuPont de Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000)). Section 12.4 of the Agreement deems Florida law applicable to contract issues. (JA000432.)

## IX.    ARGUMENT

### A.    The District Court Erred in Holding That ClearPlay Has No Duty to Use the CustomPlay Specifications to Determine What Content to Code As Objectionable

As a matter of contract interpretation – i.e., as a matter of law – the district court ruled that ClearPlay has no duty to use the CustomPlay Specifications to determine what content to code as objectionable. The court held that the

37

Agreement "requires that ClearPlay's filters—not necessarily its methodology—be in substantial compliance with the Specifications." (JA000003.) The Agreement, however, both explicitly and necessarily requires ClearPlay to use the CustomPlay Specifications to determine what content to code as objectionable. This Court should reverse the district court's erroneous contract interpretation.

Notably, reversal of the erroneous contract interpretation does <u>not</u> require this Court to decide whether ClearPlay indeed failed as a factual matter to use the CustomPlay Specifications to determine what to code as objectionable. Although Nissim believes the record on that point is clear and unambiguous (*see supra* Parts VI.D.1.-2.), the district court did not reach that question and ruled solely as a matter of contract interpretation that ClearPlay had no duty. The issue on appeal is limited to whether that contract interpretation was erroneous.

### 1. <u>The Agreement Explicitly Requires ClearPlay to Use the CustomPlay Specifications to Determine What Content to Code As Objectionable</u>

Numerous provisions of the Agreement explicitly require ClearPlay to use the CustomPlay Specifications in determining what content to code as objectionable.

<u>Section 1.4(iii).</u> Section 1.4(iii) states that ClearPlay's products "shall be in substantial compliance with the CustomPlay Specifications, it being recognized by the parties that application of the CustomPlay OC Specifications requires

flexibility of artistic judgment within the overall goal of maintaining consistency."
(JA000419.)  "[A]pplication of the CustomPlay OC Specifications"
unambiguously establishes that ClearPlay is to apply the CustomPlay
Specifications when determining what to code as objectionable.  The reference to
the "overall goal of maintaining consistency" – i.e., consistency in application of
the CustomPlay Specifications – reinforces the point.

The district court itself relied on section 1.4(iii) in erroneously holding that
ClearPlay has no duty to use the CustomPlay Specifications to determine what to
code as objectionable.  The district court selectively quoted the portion requiring
"that a ClearPlay CustomPlay OC Map 'shall be in substantial compliance with the
CustomPlay Specifications'" (JA000003 (quoting Agreement § 1.4(iii))) and
concluded that the Agreement requires only that the filters comply with the
specifications, but does not require ClearPlay to use the specifications to determine
what to code as objectionable.  The district court thus improperly disregarded the
reference in section 1.4(iii) to "application of the CustomPlay OC Specifications."
(JA000419 (emphasis added).)  It is error to read terms out of a contract.  *Paladyne*
*Corp. v. Weindruch*, 867 So. 2d 630, 633 (Fla. Dist. Ct. App. 2004) ("[W]henever
possible, courts should give effect to all provisions of a contract."); *see also City of*
*Homestead v. Johnson*, 760 So. 2d 80, 83 (Fla. 2000) ("[A]ny ambiguity in the

39

terms should be resolved in favor of upholding the purpose of the agreement and giving effect to every term in the agreement.").

Moreover, the district court's explanation is a non sequitur, and conflicts with this Court's decision in *Nissim I.* Yes, the filters must substantially comply with the CustomPlay Specifications. But that hardly negates the clear <u>additional</u> duty of ClearPlay to use the CustomPlay Specifications to determine what content to code as objectionable. This Court's decision in *Nissim I* makes that duty inescapable. In addition to holding that "[t]he Specifications are the standard against which the substantial compliance of ClearPlay's OC maps must be measured according to the plain language of the Agreement," *Nissim I*, 374 Fed. App'x at 991, this Court held that ClearPlay cannot "deviate from the Specification whenever it determines that the objectionable material is too important to plot line or movie relevance," *id.* at 992, cannot "in the exercise of its artistic judgment, refuse to code material," *id.* at 993, and cannot "refuse to code objectionable material because it believes the relevance to outweigh the objectionableness," *id.* All of these statements mean that ClearPlay is indeed obligated under the Agreement to determine what to code as objectionable using the CustomPlay Specifications rather than using ClearPlay's independent judgment. The district court's decision purports to reauthorize ClearPlay to do exactly what this Court has forbidden. Plainly, that cannot be allowed to stand.

40

The district court and ClearPlay have swung from an improper interpretation in which the artistic-judgment clause "swallowed the substantial compliance rule," *Nissim I*, 374 Fed. App'x at 992, to an improper interpretation that strikes the clause, with its reference to "application of" the CustomPlay Specifications, from the Agreement altogether.  Under the prior erroneous interpretation, Nissim's allegations of filter noncompliance were not even reached because ClearPlay's methodological argument – artistic judgment – trumped compliance with the CustomPlay Specifications.  Under the new erroneous interpretation, ClearPlay has no duty to apply the CustomPlay Specifications after all.  The new interpretation improperly rewrites the Agreement just as much as the old one.

Section 1.4(iii) establishes that ClearPlay is obligated to use the CustomPlay Specifications to determine what to code as objectionable.

Section 1.4(i).  ClearPlay is authorized to make and sell only filters that "identif[y] the beginning frame and the ending frame of . . . possibly objectionable content . . . using the categories and levels standardized by the CustomPlay OC Specifications."  (JA000419 (emphasis added).)  For ClearPlay's filters to identify objectionable content using the CustomPlay Specifications obviously requires ClearPlay to use the CustomPlay Specifications to identify what content is objectionable.  The district court's holding that the Agreement does not require

41

ClearPlay to use the CustomPlay Specifications to identify objectionable content is erroneous and renders the requirements of section 1.4(i) meaningless.

Section 4.3.  Titled "License to Use Proprietary CustomPlay OC Specifications," section 4.3 "licenses ClearPlay to use the CustomPlay OC Specifications to make ClearPlay CustomPlay OC Maps."  (JA000422 (emphasis added).)  The grant of a license for ClearPlay to use the CustomPlay Specifications to make filters demonstrates that ClearPlay is to use the CustomPlay Specifications to make filters.  The district court's holding that ClearPlay is not required to use the CustomPlay Specifications to determine what content to code as objectionable is erroneous.

Section 4.8.  Titled "Omitting Mapping," section 4.8 states that "ClearPlay may select to omit coding a content category at a specified level of explicitness for a particular motion picture only when the content falling within that category of content at that specified level of explicitness is essential to general appreciation of understanding of the motion picture."  (JA000423.)  Obviously, the only way to identify "content falling within [a] category of content at [a] specified level of explicitness" (*id.*) is to use the CustomPlay Specifications.  No other source or methodology could possibly yield the answer to what "fall[s] within" a category and level.  Contrary to the district court's stated view that the Agreement concerns only the result, section 4.8 is all about "how [ClearPlay] gets there" (JA000003), as

42

this Court's decision in *Nissim I* shows, *see* 374 Fed. App'x at 993 (explaining that ClearPlay's artistic-judgment theory rendered section 4.8 "entirely superfluous," and that ClearPlay does not otherwise have "discretion" to "refuse to code material"). Section 4.8 demonstrates that ClearPlay is required to follow the CustomPlay Specifications to determine what content to code as objectionable.

The district court's holding that ClearPlay is not required to use the CustomPlay Specifications to determine what content to code as objectionable is contrary to the Agreement.

Section 11.4. The Agreement provides that its terms are confidential, except that "the parties may indicate . . . that ClearPlay is adopting the CustomPlay Specifications." (JA000431 (emphasis added).) By publicly agreeing to adopt the CustomPlay Specifications, ClearPlay committed to using those specifications to make its products. "ClearPlay is adopting the CustomPlay Specifications" is incompatible with the district court's holding that ClearPlay has no obligation to use the CustomPlay Specifications to determine what content to code as objectionable. The whole purpose of the CustomPlay Specifications – their raison d'etre – is to define what content to code as objectionable. (*See* JA000419 (Agreement § 1.8) (defining the CustomPlay Specifications as "consisting of definitions for twelve content categories of objectionable content . . . with respect to three levels of explicitness") (emphasis added)).

43

Schedule A – The CustomPlay Specifications.  In Florida, "[i]t is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *OBS Co. v. Pace Constr. Corp.*, 558 So. 2d 404, 406 (Fla. 1990).  No magic words such as "incorporation by reference" are required.  *Computer Sales Int'l, Inc. v. State Dep't of Revenue*, 656 So. 2d 1382, 1384 (Fla. Dist. Ct. App. 1995) (citing *OBS* and holding that explicit incorporation by reference was unnecessary for document to be considered "an essential part of the contract"); *Franzen v. Lacuna Golf Ltd. P'ship*, 717 So. 2d 1090, 1092 (Fla. Dist. Ct. App. 1998) (following *OBS* and distinguishing a case in which an agreement "made only a vague reference to the collateral agreement and did not attach the agreement as an exhibit").  Thus, for example, a signed and initialed lease purchase agreement was binding where it was "attached to, and provided a material part of the consideration for, the lease transaction (memorialized by its own 11-page, duly-executed written agreement)." *A.I.C. Trading Corp. v. Susman*, 40 So. 3d 769, 773 (Fla. Dist. Ct. App. 2010).

Section 1.8 of the Agreement states: "'CustomPlay OC Specifications' shall mean the CustomPlay specifications created by CustomPlay, and held as a trade secret by CustomPlay, attached as Schedule A hereto . . . ." (JA000419.)  The 80-page CustomPlay Specifications were attached to the Agreement, and the parties

initialed each page of the Agreement and each page of the CustomPlay Specifications in like manner.  The CustomPlay Specifications were thereby made part of the Agreement, and their contents are binding on ClearPlay.

The CustomPlay Specifications mandate identification and coding of content they define as objectionable.  For each of twelve categories of objectionable content, the CustomPlay Specifications provide seven subsections: (1) Function; (2) Definitions; (3) Implied; (4) Explicit; (5) Graphic; (6) Restrictions; and (7) Clarifications.  (JA000452-531.)  The Function subsection for each category begins with a specific command to identify certain content.  (*Id.*)  For example, the Function subsection 1.1 in the category Bigotry commands: "Identify content depicting bigotry, discrimination, or prejudice."  (JA000435.)  The Definitions, Implied, Explicit, Graphic and Clarifications subsections further define the specific content that falls within the category and that the Function section requires to be identified.  (*E.g.*, JA000435-39.)  The Restrictions subsection explains what <u>not</u> to code, and is itself phrased as a command: "Do not code . . . ."  (*E.g.*, JA000438-39.)  The Clarifications subsection contains additional commands to code or not to code certain content.  (*E.g.*, JA000439.)

The requirement of section 1.4(iii) that ClearPlay's products "shall be in substantial compliance with the CustomPlay Specifications" (JA000419), combined with the fact that the CustomPlay Specifications are a binding part of the

Agreement, means that ClearPlay must obey the commands for content coding that are set forth in the CustomPlay Specifications.  *OBS*, 558 So. 2d at 406.  The command in each Function section to "[i]dentify" imposes a duty on ClearPlay to determine what to code according to the Definitions, Implied, Explicit, Graphic and Clarifications subsections of that category.  (*See also* JA000419 (Agreement § 1.4(i)) (requiring identification of content using the CustomPlay Specifications).) The commands in each Restrictions section <u>not</u> to code impose a duty not to code the specified content for that category. The commands in each Clarifications section to code or not to code impose a duty to code or not code the specified content.

The CustomPlay Specifications are part of the Agreement and impose a duty on ClearPlay to use those specifications to determine what content to code as objectionable.

### 2.  **Even If ClearPlay's Duty to Use the CustomPlay Specifications to Determine What to Code as Objectionable Were Not Explicit, It Would Be a Necessary Implication**

Under Florida law, "a court must construe a contract in a manner that accords with reason and probability; and avoid an absurd construction."  *Kipp v. Kipp*, 844 So. 2d 691, 693 (Fla. Dist. Ct. App. 2003).  Moreover, "most contracts contain implied conditions that are indispensable in effectuating the intentions of

the parties," 11 Richard A. Lord, *Williston on Contracts* § 31:7, at 321 (4th ed.

1999), including conditions that are "too obvious to need expression," *id.*

> Under "general principles of contract law," a failure to locate
> explicit contractual language does not mark the end of proper
> judicial interpretation and construction. . . . [I]f the interpreting
> court can discern from the contract as a whole what the parties
> "must have intended," it should enforce that intention despite a
> lack of express terminology.

*Dobson v. Hartford Fin. Servs. Group, Inc.*, 389 F.3d 386, 399 (2d Cir. 2004). *See*

*also Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 329 (1927) ("[A] contract

includes, not only the promises set forth in express words, but, in addition, all such

implied provisions as are indispensable to effectuate the intention of the parties and

as arise from the language of the contract and the circumstances under which it

was made.").

Here, the district court itself conceded that "it would be logical for ClearPlay

to use the Specifications to decide what to code as objectionable content."

(JA000003.)  The reason it would be logical is that it would be impossible for

ClearPlay to comply any other way except by pure accident.  Obviously, the

Agreement does not envision that compliance will be accomplished by accident.

Rather, the Agreement envisions compliance by adherence to the eighty pages of

rules, definitions, clarifications, restrictions and exceptions in the CustomPlay

Specifications.

Recognizing ClearPlay's duty to use the CustomPlay Specifications to determine what to code as objectionable is the only interpretation that "accords with reason and probability," *Kipp*, 844 So. 2d at 693, and the only way to "avoid an absurd construction," *id*. ClearPlay agreed to make filters that code objectionable content in compliance with the CustomPlay Specifications, agreed to apply the CustomPlay Specifications in making compliant filters, agreed to identify objectionable content using the CustomPlay Specifications, took a license to use the CustomPlay Specifications, agreed to limited conditions for omitting the coding of content falling within the CustomPlay Specifications, and agreed to publicly announce that it was adopting the CustomPlay Specifications. These explicit duties are incompatible with the notion that ClearPlay is not required to use the CustomPlay Specifications to determine what content to code as objectionable. The Agreement plainly requires ClearPlay, as patent licensee, to make products according to the specifications of Nissim, the patent licensor. The idea that ClearPlay has no duty to use the CustomPlay Specifications to determine what content to code as objectionable is at a minimum unreasonable and improbable, and conflicts with the purpose of the Agreement.

General principles of contract law, as well as common sense, compel the conclusion that ClearPlay is obligated to use the CustomPlay Specifications when determining what content to code as objectionable. This Court should reverse the

48

district court's erroneous contract interpretation and hold that the Agreement requires ClearPlay to use the CustomPlay Specifications to determine what content to code as objectionable.

### B.    The District Court Erroneously Rejected Nissim's Motion to Hold That ClearPlay's Withdrawal of the Sample Filters Operated as a Concession of Noncompliance as to the Universe of 2,000 Filters Represented by the Sample

This Court's opinion in *Nissim II* stated that the district court could hold on remand that "ClearPlay's withdrawal of the eight samples operated as a concession that all of the filters were noncompliant."  499 Fed. App'x at 30.  Nissim accordingly moved the district court on remand to hold exactly that.  The district court, however, denied the motion without explanation and before ClearPlay was even obligated to file a response.[7]

This Court's statement in *Nissim II* is consistent with the line of inquiry during oral argument in that appeal.  As soon as counsel for ClearPlay began to speak, the Court interrupted and asked why withdrawal of the eight sample filters did not operate as a concession as to the universe of 2,000:

> MR. PAGE: Your Honor, Reid Page on behalf of ClearPlay.  May it please the Court.  There are two motions that are --
> THE COURT:        Mr. Page, let me ask you a question.

---

[7] In *Nissim II*, this Court instructed: "Should the district court again choose to dismiss this case on remand, regardless of the basis, we encourage the court to set forth its reasoning in a written order."  499 Fed. App'x at 29 n.5.

MR. PAGE: Yes.

THE COURT: Let's say that I'm -- I'm gonna sell some apples, and I have a big barrel full of apples. If somebody comes along and accuses that -- accuses me of selling bad apples, and we've got a limited time to look at all the apples, and we decide, you pick five apples, I'll pick five apples, and on the basis of those ten apples, we're gonna decide whether I get to sell the remainder of the barrel of apples or not. You pick -- you go, you pick five, I'll pick five. We set them up, and as we're going through the review, you concede that some of them are bad, and -- and -- and -- and, so you can see some of them are bad as we're going through there and then, all the apples are taken off -- off the shelf -- I say, I'm gonna take all the apples off. We no longer have ten apples to look at, and that's pretty much what happened here, right? I mean, the -- the court -- the district court at that point said that the case is moot, because we no longer have the eight filters, we no longer have the ten apples. But if the apples have been removed off the shelf, as were the filters, doesn't that mean that the -- and those apples were intended to represent the entire universe -- and we decided, based on these ten, we're gonna decide the remaining apples -- isn't it the case that when your client removed the eight filters off the market, conceded problems with some of them, that that means that all of the filters, all of them, are substantially noncompliant?

MR. PAGE: It would, Your Honor, if you were using a sample set procedure.

Oral Argument at 17:44-19:26, *Nissim Corp. v. ClearPlay, Inc.*, No. 2012-1188

(Fed. Cir. Dec. 11, 2012) [hereinafter "*Nissim II* Oral Argument"], *available at*

http://www.cafc.uscourts.gov/oral-argument-recordings/2012-1188/all.

ClearPlay thus agreed that withdrawal of the eight filters would operate as a

concession of noncompliance as to the universe of 2,000 filters, if a sample-set

procedure was being used. In fact, a sample-set procedure was being used.

(JA007021; JA007483.)  Hearings were just a few weeks away when ClearPlay

scuttled the whole proceeding, as this Court noted.  *Nissim II*, 499 Fed. App'x at 29

("It was before the court and could easily have been resolved by the representative

sample had ClearPlay not frustrated that effort by withdrawing the sample filters,

throwing out years of work.").

ClearPlay argued, however, that this Court's decision in *Nissim I* held the

use of a sample-set procedure impermissible.  *Nissim II* Oral Argument at 20:16-

20:24 ("[T]here were critical statements in the Federal Circuit opinion that was

issued in May of 2010 that eliminated the capability to use the sample set.").  The

decision in *Nissim II*, however, rejected ClearPlay's argument and confirmed that

withdrawal of the sample filters indeed had consequences for the universe they

represented.  *Nissim II*, 499 Fed. App'x at 30 ("[O]ur opinion in *Nissim I* does not

preclude the court from using a representative sample.  The district court might, for

example, determine that ClearPlay's withdrawal of the eight samples operated as a

concession that all of the filters were noncompliant."); *see also id.* at 28

(explaining that sample-set procedure remained permissible after *Nissim I*).

On remand from *Nissim II*, the district court should have accepted this

Court's ruling and granted Nissim's motion for a determination that withdrawal of

the eight sample filters operated as a concession that the universe of 2,000 filters

was noncompliant.  Failure to grant the motion was error.  This Court should

reverse the denial of the motion and clearly hold that withdrawal of the eight

representative-sample filters operated as a concession that the universe of 2,000

filters was noncompliant.

### C. Resolution of the Issues on Appeal Is Necessary Whether or Not Another Remand Is Feasible

In *Nissim II*, ClearPlay unsuccessfully argued that this Court should hold the

case moot because the Agreement terminates on December 31, 2013. According to

ClearPlay, that left too little time for relief on remand. The present appeal comes

with less time remaining before the Agreement expires. Then as now, however,

the issues on appeal include interlocutory rulings on matters of law that could

potentially have collateral consequences in the related 2008 Infringement Case if

left uncorrected. Indeed, the 2008 Infringement Case has been stayed pending

resolution of this appeal. *Nissim Corp. v. ClearPlay, Inc.*, No. 9:08-cv-80535-

PCH, slip op. at 1 (S.D. Fla. May 21, 2013) ("The present case is currently stayed

pending final resolution of the 2004 case, and the parties agree that the stay should

be continued. Accordingly, it is hereby ORDERED that this case is STAYED . . .

."). If ClearPlay raises another mootness argument, it should be readily rejected.

A case is not moot if the trial court's order will have "possible collateral

legal consequences." *Wakefield v. Church of Scientology of Cal.*, 938 F.2d 1226,

1229 (11th Cir. 1991); *see also Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1345-46

(Fed. Cir. 2003) (holding that litigant failed to meet "the heavy burden of

establishing mootness" where decision might have collateral consequences); 13B

Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice &*

*Procedure* § 3533.2, at 805-06 (3d ed. 2008) (stating that a matter is not moot if it

"may have consequences on remaining related disputes between the parties").  The

possibility that a trial court's order will have collateral legal consequences prevents

a case from becoming moot "even though some of the original relief requested may

be moot."  *B & B Chem. Co. v. U.S. Envtl. Prot. Agency*, 806 F.2d 987, 990 (11th

Cir. 1986).

This Court applies regional circuit law on purely procedural matters,

including preclusion.  *RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255,

1261 (Fed. Cir. 2003).  Eleventh Circuit law therefore applies, and as this Court

explained in *RF Delaware*, the Eleventh Circuit treats as "final" for preclusive

purposes "'any prior adjudication of an issue in another action that is determined to

be sufficiently firm to be accorded conclusive effect.'"  *Id.* (quoting *Christo v.*

*Padgett*, 223 F.3d 1324, 1339 n.47 (11th Cir. 2000)).

The two interlocutory rulings now on appeal could, if "sufficiently firm," *id.*,

have collateral consequences in the 2008 Infringement Case.  In that litigation,

Nissim has sued ClearPlay for patent infringement based on ClearPlay's

manufacture and sale of products that, inter alia, do not comply with the terms of

the Agreement.  ClearPlay has asserted the affirmative defense of license.  *See*

53

Answer to Complaint and Counterclaim for Declaratory Judgment and Breach of

Contract at 7, *Nissim Corp. v. ClearPlay, Inc.*, No. 9:08-cv-80535 (S.D. Fla. Feb.

9, 2009) ("Nissim's claims against ClearPlay are barred either in whole or in part

by the License Agreement.").  Nissim plans to overcome ClearPlay's license

defense by, inter alia, showing that ClearPlay breached its duties and failed to

comply with the Agreement.

Each of the rulings on appeal is a matter of law that, unless corrected, could

potentially have collateral consequences for Nissim's ability to establish breach

and noncompliance in the 2008 Infringement Case.  First, as explained above (*see*

*supra* Part IX.A.), the district court erred by interpreting the Agreement as

imposing no duty on ClearPlay to use the CustomPlay Specifications to determine

what content to code as objectionable.  In the 2008 Infringement Case, Nissim

plans to overcome ClearPlay's license defense by showing, inter alia, that

ClearPlay breached that very duty.  The district court's erroneous interpretation in

the present case, if left uncorrected, potentially could have collateral consequences

for Nissim's position in the 2008 Infringement Case.

Second, as explained above (*see supra* Part IX.B.), the district court erred by

denying Nissim's motion for relief on remand from *Nissim II*.  In that motion,

Nissim argued, as this Court explicitly suggested in *Nissim II*, that ClearPlay's

withdrawal of the eight sample-set filters operated as a concession of

54

noncompliance as to all filters represented by the eight. In the 2008 Infringement Case, Nissim plans to overcome ClearPlay's license defense by showing, inter alia, that ClearPlay's filters were noncompliant, and in particular, that ClearPlay's withdrawal of the eight representative-sample filters operated as a concession of noncompliance as to all represented filters. The district court's erroneous denial of the motion for relief on remand, if left uncorrected, potentially could have collateral consequences for Nissim's position in the 2008 Infringement Case.

Recognizing the potential effect of this appeal on the 2008 Infringement Case, the district court has stayed the 2008 Infringement Case pending resolution of this appeal. *Nissim Corp. v. ClearPlay, Inc.*, No. 9:08-cv-80535, slip op. at 1 (S.D. Fla. May 21, 2013). Both parties agreed that the stay pending this appeal was appropriate. *Id.* (noting that "the parties agree that the stay should be continued"). ClearPlay can hardly dispute the potential for collateral consequences.

The issues on appeal are matters of law that could have collateral consequences in the 2008 Infringement Case. Decision is warranted here regardless of the feasibility of another remand.

## X.    CONCLUSION

This Court should reverse the district court's contract interpretation that ClearPlay has no duty to use the CustomPlay Specifications to determine what

content to code as objectionable.  This Court should also reverse the district court's

denial of the motion for relief on remand, and hold that ClearPlay's withdrawal of

the eight sample-set filters operated as a concession of noncompliance as to the

universe of 2,000 filters that the sample filters were jointly stipulated to represent.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ John C. Carey
JOHN C. CAREY
CAREY RODRIGUEZ GREENBERG O'KEEFE, LLP
1395 Brickell Avenue
Suite 700
Miami, FL 33131
(305) 356-5455

*Counsel for Plaintiff-Appellant*

</div>

# ADDENDUM

# **ADDENDUM**

Order Denying Motion for Summary Determination ............... JA 000001-000004

Order Denying Motion for Relief on Remand,
Withdrawing Jurisdiction and Dismissing Case ....................... JA 000006-000007

United States Patent No. 5,434,678 ........................................ JA 000256-000282

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 04-21140-CIV-HUCK/O'SULLIVAN

NISSIM CORP.,

      Plaintiff,

v.

CLEARPLAY, INC., et al.,

      Defendants.

_____/

### ORDER DENYING MOTION FOR SUMMARY DETERMINATION

      This matter is before the Court on Nissim Corp.'s Motion for Summary Determination (D.E. #701), filed August 10, 2010. Nissim moves for a summary determination that ClearPlay, Inc. is not complying with the terms of the parties' November 23, 2005 Settlement and License Agreement. For the reasons below, the motion is denied, and the dispute will be submitted to the Special Master for further proceedings.

      Nissim owns several patents relating to systems for filtering objectionable content from certain video media, such as DVDs. ClearPlay produces and sells DVD players, software, and filters or maps that allow consumers to filter objectionable content from movies. Nissim sued ClearPlay for patent infringement in 2004. On the eve of trial, the parties entered into a Settlement and License Agreement. As part of the Agreement, ClearPlay agreed to comply with content coding specifications developed by Nissim's subsidiary, CustomPlay, LLC. The CustomPlay Specifications provide extensive definitions and examples of objectionable content. ClearPlay agreed to create filters that were compliant with the CustomPlay Specifications.

      In June 2007, Nissim filed a Motion to Enforce Settlement Agreement, alleging that certain ClearPlay filters violated the parties' Agreement. At issue was the degree of compliance with the CustomPlay Specifications that was required by the Agreement. Paragraph 1.4 of the Agreement defines "ClearPlay CustomPlay OC Map":

      "ClearPlay CustomPlay OC Map" shall mean a CustomPlay OC Map generated by ClearPlay. A ClearPlay CustomPlay OC Map: i) identifies the beginning frame and the ending frame of video segments that contain possibly objectionable

content, and assigns a category and a level of explicitness, using the categories and levels standardized by the CustomPlay OC Specifications; ii) shall not modify, expand, reduce, or combine, content categories, or levels of explicitness specified by the CustomPlay OC Specifications, and; iii) <u>shall be in substantial compliance with the CustomPlay Specifications, it being recognized by the parties that application of the CustomPlay OC Specifications requires flexibility of artistic judgment within the overall goal of maintaining consistency</u>. . . .

Nissim alleged that ClearPlay's filters were not substantially compliant with the Specifications, as required by Paragraph 1.4. With the parties' consent, the Court appointed a Special Master to determine whether ClearPlay's filters satisfied the requirements of the Agreement.

On March 31, 2009, the Court issued an order adopting a report and recommendation by the Special Master and denying Nissim's Motion to Enforce Settlement Agreement. In doing so, the Court found that the "artistic judgment" language in Paragraph 1.4 "grants ClearPlay discretion to depart from the CustomPlay Specifications . . . when doing so is reasonably necessary, in ClearPlay's reasonable artistic judgment, for the general appreciation or understanding of the motion picture at issue." *Nissim Corp. v. ClearPlay, Inc.*, No. 04-21140-CIV, slip op. at 4 (S.D. Fla. Mar. 31, 2009).

On appeal, the Federal Circuit reversed, finding that such an "artistic judgment exception would swallow the substantial compliance rule." *Nissim Corp. v. ClearPlay, Inc.*, No. 2009-1327, 2010 WL 1838949, at *5 (Fed. Cir. May 10, 2010). Thus, ClearPlay could not refuse to code objectionable material simply because it determined, in its own artistic judgment, that the material's relevance to the movie outweighed its objectionableness. The Federal Circuit remanded the case to this Court to determine whether ClearPlay's filters substantially comply with the Specifications.

On remand, Nissim has moved for a summary determination that ClearPlay is not complying with the Agreement. Nissim argues that ClearPlay has admitted—in numerous testimonial and written statements—that it determines what to code as objectionable content according to its own independent judgments, not according to the Specifications. And because the Federal Circuit held that the Specifications govern objectionableness, ClearPlay is noncompliant.[1] ClearPlay, on the other hand, relies on the Federal Circuit's opinion to argue

---

[1] Despite what ClearPlay says, the Court does not read Nissim's motion to argue that the Court should revisit the issues of whether ClearPlay incorporated the CustomPlay Specifications into

2

that whether its filters are in substantial compliance is an issue of fact that should be submitted to the Special Master.

The fundamental dispute here seems to be about whether the Agreement requires ClearPlay (1) to use a specific process or methodology to determine what to code as objectionable content (i.e., use the Specifications in the process of deciding what to code as objectionable content when creating its filters); or (2) to reach a specific result with its objectionable content maps (i.e., objectionable content filters that are in "substantial compliance" with the Specifications). ClearPlay seems to argue the latter. Nissim, however, argues the former—that there is a systemic, methodological compliance failure.

The Court disagrees with Nissim. Paragraph 1.4 states that a ClearPlay CustomPlay OC Map "shall be in substantial compliance with the CustomPlay Specifications." This requires that ClearPlay's filters—not necessarily its methodology—be in substantial compliance with the Specifications. Of course, if ClearPlay uses its own independent judgment instead of the Specifications when deciding what to code as objectionable content, its filters are less likely to be in substantial compliance. In light of the Federal Circuit's ruling, it would be logical for ClearPlay to use the Specifications to decide what to code as objectionable content. But the test for whether ClearPlay's filters are compliant is whether ClearPlay gets to the right result, not how it gets there. In other words, the proof of the pudding is in the eating. This requires a fact-specific inquiry, not a summary determination.

This conclusion is consistent with the Federal Circuit's opinion. The Federal Circuit indicated that the proper course on remand was to determine compliance on a case-by-case basis for each filter. *See, e.g.*, *Nissim*, 2010 WL 1838949 at *4 ("The Specifications are the standard against which the substantial compliance of ClearPlay's OC maps must be measured according to the plain language of the Agreement. It is up to the finder of fact to determine if ClearPlay meets that standard for each selected OC map."); *id.* ("Whether a particular filter for a movie is in 'substantial compliance' is a question of fact to be determined by the fact finder—namely, whether ClearPlay's [objectionable content] maps each comply with the essential requirements of the Specifications."); *id.* ("There are undoubtedly factual questions which will need to be resolved in the course of determining whether there exists substantial compliance for any given

---

its software and DVD players. Rather, Nissim's motion is limited to ClearPlay's filters, and whether ClearPlay has complied with the parties' Agreement in creating them.

3

filter."); *id.* at *5 ("Whether there is substantial compliance is for the fact finder to determine on a case-by-case basis.").

As a result, the Court finds that the proper course is to submit the dispute to the Special Master again. Although Nissim appears to object to this course of action, both parties consented to the Special Master, and the Court sees no reason to use a different procedure. Rather, the Court finds it will be more efficient and fair to use the same procedure as before, with the results from a representative sample set of filters being presumed to apply to all the filters from which the sample was obtained. (*See* D.E. #563, Order Appointing Special Master.)

For the foregoing reasons, it is ordered that Nissim's Motion for Summary Determination is denied. The parties shall submit a proposed schedule for proceedings before the Special Master by Friday, September 24, 2010.

DONE and ORDERED in Chambers, Miami, Florida, September 7, 2010.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
All Counsel of Record

4

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.: 04-21140-CIV-HUCK

NISSIM CORP.,

     Plaintiff,

vs.

CLEARPLAY, INC., *et al.*,

     Defendants.

_____/



CLOSED CIVIL CASE

THIS MATTER is before the Court upon the opinion of the United States Court of Appeals for the Federal Circuit, *Nissim Corp. v. ClearPlay, Inc.*, 499 F. App'x 23 (Fed. Cir. 2012), *reh'g denied* (Jan. 30, 2013), which reversed this Court's Order Dismissing the 2004 Proceedings as Moot (D.E. # 796), and Plaintiff Nissim Corp's Motion for Relief on Remand (D.E. # 811). Pursuant to the Federal Circuit's opinion, the case was reopened on March 25, 2013. (D.E. # 808.) The Court held a status conference on these matters on April 26, 2013.

The Federal Circuit reversed and remanded because the majority determined that there was no clearly articulated basis in the record to believe the Court withdrew jurisdiction to enforce the Settlement Agreement in this case. *See Nissim Corp.*, 499 F. App'x at 28 (Fed. Cir. 2012) ("Our review of the record also reveals no adequate basis to conclude that the court had withdrawn jurisdiction over the remaining 1992 filters."). For the reasons set forth in the status conference, the Court terminates, withdraws, relinquishes, and otherwise ends its jurisdiction over enforcement of the Settlement Agreement. At the status conference, the Court asked both parties if this ruling was clear and understood by them. The parties stated that it was and that they understood. Furthermore, the Court denies Nissim Corp's Motion for Relief on Remand (D.E. # 811). Accordingly, it is hereby

ORDERED that the case is DISMISSED and Nissim Corp's Motion for Relief on Remand (D.E. # 811) is DENIED. All other pending motions are DENIED AS MOOT.

1

JA 000006

DONE AND ORDERED in Chambers, Miami, Florida, April 29, 2013.

Paul C. Huck
United States District Judge

<u>Copies furnished to:</u>
Counsel of Record

2

# United States Patent [19]

## Abecassis

| | |
|---|---|
| [11] | Patent Number: **5,434,678** |
| [45] | Date of Patent: **Jul. 18, 1995** |

US005434678A

[54] **SEAMLESS TRANSMISSION OF NON-SEQUENTIAL VIDEO SEGMENTS**

[76] Inventor: **Max Abecassis**, 19020 NE. 20 Ave., Miami, Fla. 33179

[21] Appl. No.: **2,998**

[22] Filed: **Jan. 11, 1993**

[51] Int. Cl.6 .......................................... H04N 5/781
[52] U.S. Cl. ...................................... 358/342; 358/335; 358/311
[58] Field of Search .............. 358/342, 335, 310, 311; 360/13; 348/7, 8

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,449,198 | 5/1984 | Kroon et al. | 364/908 |
| 4,506,387 | 5/1985 | Walter | 455/612 |
| 4,520,404 | 5/1985 | Von Kohorn | 358/335 |
| 4,569,026 | 2/1986 | Best | 364/521 |
| 4,605,964 | 8/1986 | Chard | 358/142 |
| 4,744,070 | 5/1988 | Takemura et al. | 369/44 |
| 4,775,935 | 10/1988 | Yourick | 364/401 |
| 4,872,151 | 10/1989 | Smith | 369/14 |
| 4,873,585 | 10/1989 | Blanton et al. | 358/335 |
| 4,888,796 | 12/1989 | Olivo, Jr. | 379/101 |
| 4,891,694 | 2/1990 | Way | 358/86 |
| 4,930,160 | 5/1990 | Vogel | 380/63 |
| 4,930,518 | 5/1990 | Vogel . | |
| 4,947,244 | 8/1990 | Fenwick et al. | 358/86 |
| 4,995,078 | 2/1991 | Monslow et al. | 380/10 |
| 5,109,482 | 4/1992 | Bohrman | 395/154 |
| 5,130,792 | 7/1992 | Tindell et al. . | |
| 5,132,953 | 7/1992 | Matsubayashi | 369/44.37 |
| 5,195,135 | 3/1993 | Palmer . | |
| 5,223,924 | 6/1993 | Strubbe | 358/86 |
| 5,274,463 | 12/1993 | Matsumoto et al. | 358/335 |
| 5,313,297 | 5/1994 | Fukui et al. | 348/7 |

### OTHER PUBLICATIONS

"The Future of Home Entertainment", Pioneer, Advertisement in the Wall Street Journal, Sep. 28, 1992.

*Primary Examiner*—Tommy P. Chin
*Assistant Examiner*—Robert Chevalier

[57] **ABSTRACT**

This invention relates to a video system comprising integrated random access video technologies and video software architectures for the automated selective retrieval of non-sequentially stored parallel, transitional, and overlapping video segments from a single variable content program source, responsive to a viewer's preestablished video content preferences. Embodiments of the video system permit the automatic transmission of the selected segments from a variable content program as a seamless continuous and harmonious video program, and the transmission of the selected segments from an interactive video game further responsive to the logic of the interactive video game. The viewer's video content preferences being stored in the video system, and/or in a compact portable memory device that facilitates the automatic configuration of a second video system. The system's controls also provide an editor of a variable content program the capability for efficiently previewing automatically selected video segments to permit the editor to indicate the inclusion of the selected segments in the program to be viewed by a viewer. The system further integrates fiber optic communications capabilities and the read/write laser disc player capabilities to facilitate the downloading of a variable content program from a source remote to the system.

**19 Claims, 11 Drawing Sheets**





## FIG. 1

Video Segment Category Descriptive Structure

| Code | Description | None | Implied | Explicit | Graphic |
|------|-------------|------|---------|----------|---------|
| 110 | Profanity | 1 | 2 | 3 | 4 |
| 130 | Violence | 1 | 2 | 3 | 4 |
| 135 | Bloodshed | 1 | 2 | 3 | 4 |
| 150 | Monsters | 1 | 2 | 3 | 4 |
| 170 | Nudity | 1 | 2 | 3 | 4 |
| 175 | Sex | 1 | 2 | 3 | 4 |

FIG. 2A

Video Segment Element Descriptive Structure

| Code | Description | None | Minimal | Expanded | Extensive |
|------|-------------|------|---------|----------|-----------|
| 210 | Character | 1 | 2 | 3 | 4 |
| 220 | Location | 1 | 2 | 3 | 4 |
| 230 | Time | 1 | 2 | 3 | 4 |
| 340 | Detail | 1 | 2 | 3 | 4 |
| 420 | Expertise | 1 | 2 | 3 | 4 |

FIG. 2B

Video Segment Inclusion Descriptive Structure

| Code | Description | Highlight | Summary | Condensed | Detailed |
|------|-------------|-----------|---------|-----------|----------|
| 610 | Inclusion | 1 | 2 | 3 | 4 |

FIG. 2C

Video Segment Generalized Descriptive Structure

| G | PG | PG-13 | R | NC-17 |
|---|----|-------|---|-------|

Symbols MPAA Trademark

FIG. 2D



FIG. 3A

| Code | Description | None | Implied | Explicit | Graphic |
|---|---|---|---|---|---|
| 135 | Bloodshed | | | 3 (319) | |

FIG. 3B

| Code | Description | None | Implied | Explicit | G aphic |
|---|---|---|---|---|---|
| 135 | Bloodshed | 1 (329) | | | |

FIG. 3C

| Code | Description | None | Implied | Explicit | Graphic |
|---|---|---|---|---|---|
| 135 | Bloodshed | | | | 4 (339) |

FIG. 3D

FIG. 3E



**FIG. 4**



FIG. 5



FIG. 6



FIG. 7



FIG. 8A

Case 1:04-cv-2114 Case 13-1209 Document 24 Entered Page LSD Docket 07/29/2013 Page 81 of 206



FIG. 8B

Case 1:04-cv-2114 Case 13-1209 Document 24 Entered Page L82 Docket 07/29/2013    Page 82 of 206



## FIG. 8C



FIG. 9

5,434,678

| 1 | 2 |

SEAMLESS TRANSMISSION OF
NON-SEQUENTIAL VIDEO SEGMENTS

BACKGROUND OF THE INVENTION

1. Field of the Invention

The invention relates to a video device for the auto-mated selective retrieval of non-sequentially-stored video segments of a video program, from a single video program source, responsive to a viewer's preestablished video content preferences, and the transmission of the selected segments as a seamless video program.

2. Description of the Prior Art

Conventional memory storage devices, as for example, laser disc players and computer hard disks, when accessing or transferring data randomly located on the device's memory storage unit, the read/write functions of the device must wait for the proper positioning of the read/write head from one location to another location. This operation usually referred to as the average access time and measured in microseconds is one of the primary determinants of a random access device's performance capabilities.

In full motion picture applications a device's capabilities are also critical in terms of transfer rates and storage capacity. A typical motion picture runs at 30 frames per second. In digital terms, reasonable quality video, such as may be obtained from a VCR tape, requires approximately 1.5 megabytes per second, or a total of 10,800 megabytes for a two hour film. While the application of compression technologies reduces the storage requirements, this is offset by the greater requirements of high definition television (HDTV).

As a result of the storage capacity, transfer rates, and average access times, laser optical technology has proven its costs effectiveness in full motion picture applications. State of the art laser video disc systems, such as for example Pioneer's VDR-V1000, incorporates separate optical heads for recording and erasing, and provides an average access time of 0.3 seconds. While in most applications a 0.3 seconds average access time can be accommodated, this proves not be the case when a continuous seamless retrieval of random frame sequences from a single video source is required. A 0.3 average access time translates into a gap of 0.3 seconds (approximately 9 frames) each time a non-sequential frame needs to be retrieved. Where the viewing of a motion picture requires a significant number of such random accesses, the repeated gaps represent a significant failing.

Various data and video read and read/write architectures, such as those comprising: i) a single head; ii) multiple heads, in which each head operates on a different source surface; iii) multiple heads operating in one surface, in which each set of heads moves over the surface as a single unit; and iv) multiple heads, in which each head's movement over the shared surface and function is independent of the operation of the other heads; provide different average access time and transfer rate capabilities.

For example, the patent to Takemura et al., U.S. Pat. No. 4,744,070, discloses a tracking method for an optical disc in which two laser spots irradiate two adjoining slants of a V-shape groove. Since the laser spots movement over the disc surface are in unison, the shortcomings of access time gaps are not resolved.

With respect to the objects of the present invention, the shortcomings of the prior art known to the applicant

are not limited to the hardware architecture. From the outset, film production has and continues to be directed at the eventual production of a unique linear sequence of frames.

In the creation of motion picture, producers and artists often surrender the exercise of creative expression to the inherent constraints of an unique linear sequence of frames, generally accepted norms, marketing objectives, and the censoring influence of the Motion Picture Association of America, Inc. rating system. In general, the resulting compromise inevitably provides for scenes, content, or artistic expression, which either exceeds or fails to satisfy individual viewer preferences. Too often, gains made in the exercise of creative expression result in the loss of potential audience. To that extent, recently a number of films are issued in an U.S. version, and a more explicit European version.

Viewers that are attracted by the general subject matter of a motion picture, and, on the basis of the MPAA's motion picture rating system, elect to view the motion picture are subjected to material in the program they would not have selected for their own viewing. In a 1989 poll conducted by the Associated Press, 824 of the respondents felt that movies contained too much violence, 804 found too much profanity, and 724 complained of too much nudity.

A number of editing systems in the prior art have attempted to address these issues. For example, the patent to Von Kohorn, U.S. Pat. No. 4,520,404, discloses a remote recording and editing system, whose functions include the activation or deactivation of a television receiver and a recording apparatus by the transmission of control or editing command signals, generated from a central station where an operator monitors a broadcast transmission. Similarly, the patent to Chard, U.S. Pat. No. 4,605,964 discloses a television controller that utilizes coding for identifying and automatically deleting undesirable sound and visual event broadcast with a program. The patent to Olivo, Jr., U.S. Pat. No. 4,888,796, discloses a screening device capable of automatically disabling the TV or video receiving device in response to the receiver's recognition of a non-interfering material content signal co-transmitted with the program signals. However, even the aggregation of Von Kohorn, Chard, and Olivo, fails to suggest a video software/hardware architecture wherein the disabling of segments of the program material does not produce dead segments.

The patent to Vogel, U.S. Pat. No. 4,930,160, addresses the resulting dead segments in the transmission by providing a facility for displaying alternative material during the dead segments. The alternative material selected during censorship periods can originate from a remote source, for example, another television broadcast, or locally, for example, from a video disc or tape player. However, Vogel and the prior art known to the applicant, do not provide a system that creates, from a single source, an automatically edited, seamlessly continuous program in which edited out segments are replaced with other parts of the same program responsive to a viewer's preestablished video content preferences.

The patent to Bohrman, U.S. Pat. No. 5,109,482, discloses and is titled "Interactive Video Control System for Displaying User-Selectable Clips". In Bohrman, it is the viewer that, with precise knowledge of the contents of the video segments of a program, interactively creates an arrangement of the viewer selected

5,434,678

3

segments. In other words the segments are not automatically selected and arranged responsive to a viewer's preestablished content preferences. Additionally, Bohrman fails to address the problems associated with the laser disc player's average access times.

A number of other interactive systems in the prior art provide viewers the means to participate, and thereby affect, the program's story lines or plot. The patent to Best, U.S. Pat. No. 4,569,026, discloses a video entertainment system where human viewers conduct simulated voice conversations with screen actors or cartoon characters in a branching story game shown on a television screen. As opposed to passive systems, the essence of interactive video systems is a viewer's participation. In interactive systems, at frequent points, the system's continued operation is dependent on the viewer's response.

In electronic games, of which Sega's CD ROM System for Genesis is an example, the access time of approximately one second results in noticeable pauses in the action, the effect of which is also mitigated by the interactive nature of the software. As a result of their interactivity, these systems can accept significantly slow random access times.

Further, as electronic games have been principally directed at children, or contain primitive subject matter, they have not dealt with issues raised by the more complex adult forms of expression inherent in contemporary motion picture films. While electronic games provide setup editing capabilities (selection of: level of difficulty, character, weapons, etc.), they do not provide censoring editing capabilities. This is clearly evidenced in the discussion, marketing, and development of video games dealing with material generally deemed not suitable for children. Given the random access capability of CD-based systems, it is surprising that when dealing with adult subject matter, the inherent limitations of conventional films and the MPAA's rating system have been adopted by forthcoming CD based video games.

Thus the prior art known to the applicant has failed to show an integrated software and hardware architecture that provides for the automated selective retrieval of non-sequentially stored video segments of a program, from a single program source, responsive to a viewer's preestablished viewing preferences, and the transmission of the selected segments as a seamless video program.

## SUMMARY OF THE INVENTION

These and other shortcomings of the prior art are overcome by the various features of the present invention which are directed to a seamless transmission of non-sequential video segments. For purposes of the present invention, various terms or nomenclature used in the art are defined as follows:

The term "viewer" as used herein is meant to include and be interchangeable with the words "player" (when referring to a person), subscriber, and "user". That is, the term "viewer" ought to be understood in the general sense of a person passively viewing a video, interactively playing a video game, retrieving video from a video provider, and/or actively using multi-media.

The terms "video" and "video program" are interchangeable and refer to any video image regardless of the source, motion, or technology implemented. A "video" comprises images found in full motion picture programs and films, in interactive electronic games, and in video produced by multimedia systems. Unless other-

4

wise qualified to mean a computer software program, the term "program" is interchangeable and may be replaced with the word "video". While a particular feature may be detailed with respect to a specified viewing, gaming, or computing application, it is intended herein to apply the teachings of the present invention broadly and harmoniously across the different classes of applications that generate a video output.

The terms "variable content program" and "variable content game" refer to a specific video program characterized by a greater variety of possible logical content sequences that result from the additional segments provided for that purpose. The term "content" referring principally to the form of expression rather than the story-line. Where initially produced as a variable content program, the video utilizes parallel, transitional, and overlapping segments to provide viewing of a program's story-line/interactive action at different levels of forms of expression.

The term "video content preferences" refers to a viewer's preferences as to the "content" of a video. "Video content preferences", specifically and principally, although not exclusively, refers to a viewer's preestablished and clearly defined preferences as to the manner or form (e.g. explicitness) in which a story/game is presented, and the absence of undesirable matter (e.g. profanity) in the story/game. In the broadest sense the term "video content preferences" further includes "video programming preferences", which refers exclusively to a viewer's preferences as to specific programs/games (e.g. Sega's "Sherlock Holmes Consulting Detective"), types of programs/games (e.g. interactive video detective games), or broad subject matter (e.g. mysteries). In contrast to the prior art "video-on-demand" systems which are responsive to a viewer's "video programming preferences"; a more inclusive "content-on-demand" system as per the teachings of the present invention is responsive to a viewer's "video content preferences".

The term "seamless" is intended in the sense that the transmission of sequential and non-sequential frames is undiscernible to the eye, and not in the sense of the natural video seams that result in the intended changes from one scene to another, from one camera angle to the other, or from one gaming sequence to the other. In a seamless transmission of a variable content motion picture a constant video frame transmission rate is maintained, whether the frames are sequential or non-sequential.

The terms "B-ISDN", specifically referring to a broadband integrated services digital network, and "fiber optic", specifically referring to a network comprising fiber optic cable, refer to any "communications" means, private or public, capable of transmitting video from a remote video source to a viewer. In the broadest sense these terms further comprise satellite communications.

Where not clearly and unambiguously inconsistent with the context, these and other terms defined herein are to be understood in the broadest possible sense that is consistent with the definitions.

Accordingly, in view of the shortcomings of the prior art, it is an object of the present invention to provide a device comprising integrated random access video technologies and video software architectures that furnishes a viewer the automated selective retrieval of non-sequentially stored, parallel, transitional, and overlapping video segments from a single variable content

5,434,678

5                                                               6

program source, responsive to the viewer's preestablished video content preferences, and transmits the selected segments as a logical, seamless, and continuous video program.

It is another object of the invention to provide an interactive video game system comprising interactive video game software, variable content game, and a program segment map defining segments of the variable content game, furnishing a player of the interactive video game the automatic and logical selection of video segments responsive to the application of the player's video content preferences to the program segment map, and responsive to the logic of the interactive video game software.

It is yet another object of the present invention to provide a device that furnishes a previewer of a variable content program the capability for efficiently previewing automatically selected segments from the program, responsive to a viewer's preestablished preferences, to permit the previewer to indicate the inclusion of the selected segments in the program to be viewed by the viewer.

It is yet another object of the present invention that a viewer's video content preferences be stored in a portable memory device.

· It is yet another object of the present invention to integrate fiber optic communications capabilities and read/write laser disc player capabilities within a single device to facilitate the downloading of a motion picture program from a source remote to the device.

It is yet other objects of the present invention to provide a variety of reading architectures that produce a seamless reading of sequential and non-sequential segments of a variable content program from a single video source.

Briefly these and other objects of the invention are accomplished by means of the random access video technologies detailed herein in combination with the teachings herein of a variable content program.

Unlike traditional film media that permits a program format with only a single sequence of frames, random access video technologies make possible a variable content program format that is characterized by a variety of possible logical sequences of video frames. In a variable content program the artist and program producer are challenged to create greater variety in the form of expression, and utilize parallel, transitional, and overlapping segments to provide viewing of a program at that level of expression, content, detail, and length, that is consistent with a variety of viewer preferences.

In contrast to interactive motion pictures, and full motion video games, in a variable content program it is principally the form of expression that is the object of alternate frame sequences, rather than the story-line. In a variable content program, each of the significant scenes and actions can be implicitly expressed, as found for example in a "PG" rated film, explicitly expressed, as found for example in an "R" rated film, and graphically expressed, as found for example in an "NC-17" rated film. As a result, unlike motion pictures which are packaged as a single sequence of frames, the U.S. version, the European version, the edited-for-TV version, the "XXX" version, and the version addressing each viewer's particular tastes and preferences, reside harmoniously within a single variable content motion picture.

The present invention details a number of random access video technologies that permit the retrieval, in a logical order, of the non-sequential segments that comprise a variable content program without altering the transmission of the required frames per second. An embodiment of a video system as per the present invention, permits the automatic transmission of the selected segments from a variable content program as a seamless continuous and harmonious video program responsive to a viewer's preestablished video content preferences. In a second embodiment, segments from an interactive video game are selected responsive to the logic of the interactive video game software and the player's video content preferences.

In a laser disc video system, random access video technologies principally comprising: multiple independently simultaneously controlled reading units, video buffer, and media architecture, permit, in one embodiment, during the read operation of one of the reading units of the video information contained in a program source, the repositioning of a second one of the reading units to the next required non-sequential position in the program source. The resulting synchronization effectively eliminating the gaps that would result from a single reading unit's average access time. That is, pauses, gaps, dead frames, and fill-ins, are eliminated in the playing of non-sequential video segment stored in a single program source.

To achieve the automated selection of only those segments consistent with a viewer's preestablished viewing preferences, each program segment in a variable content program is defined by and is associated with a content descriptive structure that provides specific and detailed information as to each segment's subject matter, level of detail, and form of expression. The segments definitions of a program further comprises a first and last frame identifier, and beginning frame identifiers of the next logical segments. The segments definitions are organized into a program segment map.

A random access device as per the present invention provides each viewer the opportunity to preestablish both any number of generalized, personalized video content preferences, and program/event specific content preferences, identifying the viewing preferences in each of a number of content categories. By analyzing a viewer's preestablished video content preferences as they relate to a program's segment map, the random access device gains the information to automatically exclude segments of the variable content program containing material which the viewer does not wish to view, and to transmit as a logical seamless transparently harmonious and continuous program only those sequential or non-sequential scenes or segments of the program whose content and form of expression are consistent with the viewer's preestablished video content preferences. The playing of a variable content program does not require that the viewer preview the contents of the segments of the program, and does not require viewer intervention during the viewing of the program.

Thus, the present invention while challenging the video program producer to fully exercise the freedom of expression, provides for the automated, seamless transmission of non-sequential video segments containing that level of artistic expression that is consistent with a viewer's preestablished video content preferences. The present invention, effectively harmonizing what are regarded in the popular press as conflicting objectives, provides an unparalleled opportunity for "freedom of expression and freedom from expression" (C).

5,434,678

7

These and other features, advantages, and objects of the present invention, are more easily recited and are apparent in the context of the detailed description of the invention, accompanying drawings, and appended claims, that follow.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a flow chart summarizing the steps of producing a variable content program as per the present invention;

FIGS. 2A, 2B, 2C, and 2D, are illustrations of video segment descriptive structures as per the present invention;

FIGS. 3A, 3B, 3C, are diagrams of three versions of a video segment and corresponding descriptive structures, each segment a variation of the other as per the present invention;

FIG. 3D is a diagram representation of a variable content program showing the non-sequential arrangement of segments as per the present invention;

FIG. 3E is a diagram representation of a variable content program reading stream and transmission stream as per the present invention;

FIG. 4 is a sample video content preference selection screen as per the present invention;

FIG. 5 is a schematic diagram of a random access video technology device comprising fiber optic communications and variable content laser disc capabilities as per the present invention;

FIG. 6 is a schematic detail of a laser disc module's multiple reading units architecture as per the present invention;

FIG. 7 is a schematic diagram a video program provider and subscriber network architecture as per the present invention;

FIGS. 8A, 8B, and 8C, are flow charts summarizing the process of playing a variable content program as per the present invention; and

FIG. 9 is a flow chart summarizing the process of previewing flagged segments as per the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

The steps in the production of a variable content program are summarized with respect to the simplified flow chart of FIG. 1. Each scene or fragment of a scene on a video script is reviewed 130 according to an appropriate segment descriptive structure, as for example detailed with respect to FIGS. 2A–D. A screenwriter now has the freedom to expand the scenes by adding parallel, overlapping, and transitional segments, to cover a wider descriptive range 140 without the concern for the limitations inherent in first generation program formats. A successful filming 150 of this variable content architecture is a function of the skill of director(s), actors, animators, programmers, etc. to provide for parallel and transitional segments with the required transparent harmony.

In contrast to the editing of first generation motion pictures that require producing a unique linear sequence of segments, editing of this program format requires a parallel, non-sequential, logical arrangement of segments 160. A segment assigned a category descriptor may be congruent in one or more frames with a segment assigned a different category descriptor. Where necessary, a video segment is associated with more than one audio segment, and corresponding separate voice and video category descriptors are provided. The editing of

8

a variable content program is significantly distinguished from the editing of an interactive motion picture is that in the latter the editing is concerned with a branching story-line, while editing in the former is principally concerned with optional forms of expression of the same story-line.

The compiling of a variable content program/game is only limited by the requirements, desires, skill, and hardware/software available to the program editor. To that extent, it is intended that the editing functions, in particular, be assisted by integrated computerized editing resources. With respect to the computer assisted editing, the teachings of the patents to Bohrman, previously cited, and to Kroon et al., U.S. Pat. No. 4,449,198, are by reference incorporated herein. It should be appreciated that the art of program editing under this new format is intended to significantly transfer censorship, and time-constrained editing decision making from the producer/editor to the viewer.

As each segment is defined, the beginning frame and end frame in each of the relevant segments is identified, the segment content is assigned a category descriptor, and logical entry and exit references are assigned 170. The resulting segment definition is mapped 180 and the required user interface produced. The program segment map, any user interface routines particular to the program, and player control codes, if required, are provided with the information comprising the programs video and sound.

FIGS. 2A, 2B, and 2C illustrate examples of generalized descriptive structures that are utilized to review the contents of each segment contained in a given program, and to assign the appropriate segment content descriptors. Specifically, FIG. 2A illustrates a descriptive structure 210 implementing a descriptive scale 211 that mirrors the current rating system utilized by the MPAA (Motion Picture Association of America, Inc.). The MPAA's "Voluntary Movie Rating System" comprises the symbols "G", "PG", "PG-13", "R", and "NC-17" and the corresponding legends, which are trademarked/pending by the MPAA.

The descriptive structure, further includes, in this example, a number of categories 212 of conventional concern in the popular culture. Each number in the matrix 219 in the chart represents the particular descriptor for a given category that can be assigned to a specific scene or segment. For example, a scene of an old western style barroom brawl might be assigned a 130-4 (graphic violence). While the absence of an element is presumed, unless otherwise indicated, as an example, the absence of bloodshed is assigned a 135-1 (no bloodshed).

The contents of a segment are further coded on the basis of a number of other considerations. FIG. 2B is an example of an element descriptive structure 220 utilized to analyze the development 221 of a number of elements 222 such as character, location, time, degree of detail, and the level of expertise appropriate for the segment. In a similar manner, an individualized, tailored, and descriptive structure may be provided for any one category or group of categories. For example, FIG. 2C illustrates a descriptive structure 230 utilized to classify segments according to a level of inclusion 231. Such a structure is appropriate, for example, in coding a news report.

Additionally, or alternatively, a video segment descriptive structure, as shown in FIG. 2D, is implemented that incorporates the MPAA's movie rating

5,434,678

9                                                    10

system. Under this video segment generalized descriptive structure 240, segment definitions are assigned a descriptor (rating) 249 from a descriptive scale 241 incorporating the MPAA rating symbols 249, or any other available analogous rating system. Determination of each segment's rating symbol being similar to the manner in which the MPAA rating system is applied to a motion picture. While this rating scale 241 may be implemented in conjunction with categories, as detailed with respect to FIGS. 2A, and 2B, a simplified embodiment is not concerned with identifying the category, instead, the segment definition comprises frame information and a simple descriptor (rating).

It is noted that FIGS. 2A–2D are examples of an overall framework for segment analysis, the actual descriptive structures and level of complexity utilized may be highly tailored by the producer of a program to reflect the specific content of a program without being limited by the structures which will be widely accepted, constitute a standard, and found to be generally utilized in other works. Each program producer is offered the flexibility within the overall architecture of this descriptive structure to determine and include only those categories that are relevant to a particular program, and to add categories as the producer requires. Similarly, the producer is offered some flexibility in determining the labelling of the descriptive scale.

Meeting the objectives of being able to provide both a standardized set of descriptive structures that permits the automatic application of a viewer's preestablished preferences to a variety of programs, and provides the producer of the program the flexibility described above, are accomplished for example by assigning unique classification codes to each set of preestablished standardized categories, and by reserving a range of classification codes that are recognized by the system as requiring additional selection by the viewer.

FIG. 3A illustrates an example of a conventional motion picture program in which the segments are arranged as a unique sequential arrangement of frames. In a variable content program adaptation of the conventional motion picture, the various scenes 302 of the program are, according to an evaluation of the contents of the scenes, divided into appropriate segments 303. Each segment is identified with a beginning and ending frame and comprises any number of frames 304. In this example, scene three is divided into four segments, in which segment 3ii 311 begins at frame 4112 and ends at frame 6026. The next segment, 3iii, begins at frame 6027. Segment 3ii, which in a conventional motion picture contributes to an "R" rating for the program, includes frames depicting explicit bloodshed. The content of segment 3ii 311 is indicated by the numeral 3 in the appropriate cell 319 of that segment's descriptive structure.

Referring now to FIG. 3B, to provide for the option of editing-out the explicit bloodshed in a variable content program, the program segment map includes an additional segment definition 321 beginning at frame 4112 and ending at frame 5205. The end of this segment 321 is linked to a new transitional segment 322 beginning at frame 5205 and ending at 35350, the end of which is linked to frame 6027. In this fashion, frames are omitted and added to provide a continuous transparent edited version of any segment. This frame sequence 321/322 is associated with the corresponding segment content descriptive structure 329 to indicate the absence of bloodshed. In all other respects the segments 321/322

are equivalent to the original segment 311. For first generation programs, the editing-out works in a like manner except that the transitional segment 322 is not available to make the seamless transmission from frame 5205 to 6027 transparent.

To provide the option to include a graphic level of bloodshed, the program segment map includes an additional segment definition. Referring to FIG. 3C, in this case, only 66 frames of the "first" segment 311 are "ignored", and new segment definitions 331 and 332 are created, to accommodate the graphic bloodshed included in an additional segment 333 beginning at frame 35351 and ending at frame 38975. This frame sequence 331/333/332 is associated with an appropriate segment content descriptive structure 339. In this manner, parallel and transitional segments provide a descriptive selection mix ranging from a segment combination excluding bloodshed 321/322 to a segment combination including graphic bloodshed 331/333/332, as well as the segment combination including explicit bloodshed 311. As a result, the particular scene of which these segments are a part can be viewed at any of the three content levels for that category.

A scene can include subject matter of more than one category. In such cases, overlapping segments and transitional segments are provided to permit viewing of one subject matter at one descriptive level and viewing of another subject matter at another level.

Referring now to FIG. 3D, the location of the net additional frames that result from the additional segments 322/333 cause some frames to be non-sequentially placed in the variable content program 399. Ignoring the frame numbers of segment 322, FIG. 3D is illustrated to diagrammatically emphasize the resulting sequential and non-sequential random-like arrangement of video segments in a variable content program. This is shown for example, in the segment combination 331/333/332 depicting explicit bloodshed and the corresponding non-sequential frame sequence.

The segments combinations shown comprising the segment definitions together with the corresponding descriptors comprise a program segment map. A program segment map causes, for example, the retrieval of the segment combination beginning at frames 4112–5109, followed by frames 353514–38975, and ending with frames 5175–6026 in response to the application of a viewer's program content preferences to the program segment map.

In an actual feature length variable content motion picture the significant additional segment/frames are arranged responsive to the particular random access hardware architecture implemented. For example, FIG. 3E, illustrates an arrangement in which the reading unit reading stream 341 comprises alternating frames from four separate segments and is read at an effective rate of 120 frames per second. The processing architecture selecting the desired segment from the read stream 341 to generate a transmission stream 342 of the desired frames 351A–353A at a rate of 30 frames per second. This and other architectures are detailed later on with respect to FIG. 6.

A system embodying the teachings of the variable content program provides each viewer the opportunity to define a personalized video content preferences. The content preferences identifies each viewer's preferences in a range of video content categories. The architectures of a viewer's content preferences and that of the segment content descriptive structures are interrelated.

5,434,678

<table><tr><td>11</td><td>12</td></tr></table>

As is detailed below, the preferences are established prior to transmission of the program to the receiver, so that during the transmission of the program viewer intervention is not required.

FIG. 4 illustrates a program's categories descriptive chart **401** that merges the various descriptive structures of the segments of a program. For example, the category bloodshed **411** indicates that the program offers options to omit the viewing of bloodshed, or include explicit or graphic segments in the viewing of the program. In this example, depicted by bold boxes is the viewer selected level for each category. The viewer in this case has elected to omit bloodshed **412** in his/her viewing of the program. In this particular screen design, viewers indicate their selections by following the entry requests **421**, and pressing the appropriate numeric keys on the player's remote control unit to indicate the category they wish to access **422** and the viewing level for the category **423**.

In simplified terms, any segment with a descriptive level higher (abstract) than the viewer-selected level for a given category is not included in the program produced for the viewer. The segment selected for viewing (a descriptive level equal to or next lowest) provides the next segment beginning frame information, skipping over parallel segments of a lower rating than the viewed segment.

While the teaching above are detailed principally in terms of a variable content motion picture movie, clearly the teachings are applicable to any video program. Specifically, interactive video games utilizing full motion video segments can also benefit from providing the viewer/player of the game the option to preestablish video content preferences in addition to the gaming options which may be included in the video game software. As in a variable content program, in a interactive variable content video game, the video segments shown are consistent with the player's video content preferences.

The preferred hardware architecture of a video system that embodies the teachings of, and delivers the benefits of, the variable content program is referred to herein as a Random Access Video Technology system ("RAViT") (C), and is specifically detailed with respect to FIG. 5. Referring to FIG. 5 a preferred configuration of a RAViT **500** device principally comprises the following primary modules and sub-systems: i) random access laser video/data disc module **501**; ii) communications module **502**; iii) fixed memory sub-system **503**; iv) removable memory sub-system **504**; v) compact portable memory sub-system **505**; vi) external video/sound input/output support module **506**; vii) multi-user modules **507**; and viii) multi-services modules **508**.

A fixed memory sub-system **503** refers to any nonvolatile memory storage device principally utilized to randomly read/write and store significant quantities of information. An example of a present fixed memory storage sub-system is a personal computer hard disk drive, currently generally installed in 80–240 MB capacities.

A removable memory sub-system **504** refers to any nonvolatile memory storage device principally utilized to transport information to and from two similarly equipped systems. Examples of present removable memory storage sub-systems are personal computer floppy disk drives 1.2 MB, micro floppy disk drives 1.4/2.8 MB, backup tape drives 60–240 MB, and removable hard disks 20–80 MB. The random access laser disc

module **501** is another example of a removable memory storage sub-system.

A compact portable memory sub-system **505** is principally distinguished from a removable memory sub-systems **504** in the size of the media and the greater variety of memory storage technologies that are generally implemented. Nonetheless, some of the removable memory storage media such as for example, the micro floppy disk, are also considered compact portable memory media. With present technology, compact portable memory media is available in dimensions similar to conventional credit cards. Examples of compact portable memory are: laser read/write cards, in which at least one surface of the card permits a laser to read/write information; electronic cards, in which the information is stored in electronic components; and magnetic cards embodying magnetic storage technology, of which a credit card is an example. Other examples of compact portable media are electronic cartridges commonly utilized in electronic video game systems.

Clearly, a variety of memory devices are available utilizing technologies and combinations of technologies to suit particular performance requirements. The above classifications of the memory devices are directed at bringing attention to functional capabilities of RAViT rather than to a particular technology. The classifications are not intended to restrict a device to a particular classification, limit the selection of devices which may be implemented, or to limit the function of the particular device implemented.

From a marketing standpoint, it is also preferred that RAViT additionally "play" other laser media, such as for example current laser discs, CDs, CDGs, photo CDs, and interactive programs and games, in a conventional manner. This being diagrammatically shown in FIG. 5 as the five circles inside the representation of the laser disc unit **501**. In this context, it is also noted that the multimedia capabilities in RAViT in combination with its ability to extract video/sound/data from these sources offers the user sophisticated CD-ROM like capabilities and interactive full motion video gaming capabilities. As to the latter, RAViT's hardware configuration detailed herein is significantly more capable than interactive CD-based video games such as for example Sega's CD ROM System for Genesis.

In a preferred embodiment, RAViT is a fully integrated viewing/gaming/computing video system. To that extent and given the other teachings that follow herein, RAViT's laser disc module will operate at the required rotational rate to accommodate differences in software rpm requirements. This being analogous to the different available speeds in a record player.

The external video/sound input/output support module **506** supports video/sound/data transmission to the primary video display system comprising for example a monitor/television, stereo system, and keyboard/voice recognition-response. Additionally, the input/output module supports video/sound input from local sources such as for example VCR's, video cameras, and videophones. The construction of the external support module follows the conventional practices of consumer electronic products as for example: laser disc players, VCRs, and personal computers.

Multi-user modules **507** principally support separate controlled independent access by other users of RAViT's processing, video, and communications resources. A multi-user operating system such as for example a version of Unix or Windows NT, manage the

JA 000273

5,434,678

13

multi-user environment. The construction of multi-user modules following established networking technology and responsive to the operating system implemented.

Multi-services modules 508 provide a host of services, such as for example residential security, and appliance operation management. The operation of the module being principally a software application running under the multi-user operating system implemented. The construction of the particular multiservice module being responsive to the particular application. Example of a primitive multi-service module is a fax/modem pc card.

RAViT further comprises computing elements and video processing elements readily found in multimedia devices and video electronic systems such as for example and not limitation: i) microprocessor 511; ii) memory units 512; iii) video processor 513; and iv) video buffers 514.

RAViT's user control interface 531 includes communications to the buttons and keys located on the cabinet of the device, and to the associated control devices 541-2-3. The keys, buttons, and switches, conventionally found in consumer electronic devices and deemed advantageous to the operation of RAViT are implemented. These controls are further augmented by the following keys/functions: segment skipping control, preferences control, segment mapping control, and system menu control. The user control interface 531 additionally supports infrared remote control units 541, as for example infrared numeric control pad, and infrared keyboard; wire connected control units 542, as for example cable connected computer keyboards, mouses, and game controllers; and voice recognition units 543.

The keyboard, as in a personal computer implementation, facilitates system setup, keyword retrieval, and system functions requiring the entry of alpha characters. Since a preferred configuration of RAViT comprises significant multimedia capabilities, a keyboard is advantageous. A keyboard connector used to connect a standard AT keyboard or a dedicated keyboard is supplied. Alternatively, an infrared-based keyboard is implemented. Further, given the computing and storage capabilities of RAViT, a voice response sub-system option accommodating minimally the few commands, such as play, stop, mute, sound, skip, required to control the basic operation of the laser disc module can additionally be provided.

Implemented in RAViT is a digital system status display sub-system 532, which provides visual feedback and system status information.

RAViT's control programs that manage RAViT's resources, and the retrieval and processing of data and video information, reside in dedicated chips 521. Alternatively, the control programs are stored in mass memory devices 503 from installed software, in removable memory media 504, or in a compact portable memory device 505.

A variable content program not only comprises variable content video/sound information, but also comprises a corresponding program segment map, user interfaces, program routines, and system control codes. In an interactive variable content video game, the video game software also comprises a variable content program. The terms "program segment map" and the term "data", where not inconsistent with the context, are to be understood to comprise the program segment map, user interfaces, program routines, system control codes, and gaming software (where applicable). Wherever the

14

terms "variable content program" are found, and the context permits, they are to be understood to comprise all the video/sound and "program segment map" elements.

In a preferred laser disc implementation, the entire variable content program (video/sound and program segment map) is provided in a video/data disc in a format similar to that required by the video images contained in the disc. Alternatively, the data is provided in the video/data disc in a different format from that of the video format, such as for example in digital photomagnetic or magnetic formats. In this respect the teachings of the patent to Smith, U.S. Pat. No. 4,872,151, are by reference herein incorporated. In a second alternative, the data is separately provided by a removable memory media 504, a compact portable memory device 505, or downloaded by means of the communications interface 502.

A RAViT simply configured and comprising a laser disc module 501 and for example a micro floppy disk drive 504 provides editing out benefits for the existing library of motion picture laser discs. In this configuration, the micro floppy disk provides the program segment map, user interface and other control programs particular to the motion picture, and stores a viewer's video content preferences. While the resulting program suffers, as does edited-for-television programs, from the lack of transitional, parallel, and overlapping segments, this technique provides an immediate library of full motion pictures to which the teachings of the present invention is applied.

Upon a playing of a program, the control program causes the reading of the program's identifier from the program source 501, searches the mass memory fixed storage device 503 for a corresponding viewer preferences, or applicable generic preferences, and upon viewer confirmation applies the stored viewer preferences to the program segment map.

With respect to control programs, scheduling routines, viewer preferences, program segment map, and other principally software elements, it is noted that these may be separately or jointly stored in any one of RAViT's various firmware/hardware memory devices. For example, the viewer preferences are stored in nonvolatile resident memory 515, in the memory of the fixed or removable memory sub-system 503/504, a user's optical read/write access card or electronic memory card 505, or from the respective read/write video-/data laser disc 501. In an interactive video game application, data in general, and game software in particular, for example, may be downloaded to the hard disk, reserving subsequent access of the laser disc for video-/sound retrieval.

Generally, the control programs 521 generate a segment table reflecting the application of the viewer's preferences to the video program's content map. The segment table provides the control program's segment scheduling routines the information to cause the automated logical selection of sequential and non-sequential segments of the video program responsive to program segment map, the viewer's preferences, and the logic of the gaming software where applicable. The processing of the control programs being principally a function of the system cpu 511 and system RAM 512.

RAViT's video random access retrieval architecture principally comprising the video/data laser disc module 501, video cpu 513, video buffers 514 and processing capabilities, provides for the retrieval and transmission

JA 000274

5,434,678

15                                                      16

of selected sequential and non-sequential video segments stored in the disc. In terms of the integration of laser disc and processing capabilities and the retrieval of non-sequential video frames, the teachings of the patent to Blanton et al, U.S. Pat. No. 4,873,585, which details a system comprising a video disc player for storing and retrieving video frames, and a control computer for accessing particular sequences of stored frames on the video disc, are by reference incorporated herein, and are relied upon to detail the core operation and construction of a laser-based random access system. With respect to laser read/write units and read/write laser discs, the prior art teachings of laser disc players, such as for example Pioneer's Rewritable Videodisc Recorder VDR-V1000, and the teachings of the patent to Matsubayashi, U.S. Pat. No. 5,132,953, are by reference incorporated herein.

RAViT's laser disc module 501 comprises laser disc technology distinguished principally in the cooperative operation, responsive to the instructions of the segment scheduler, of the multiple read/write laser units to produce a continuous transmission of non-sequential video segments. In a laser-based random access multiple read/write architecture, each read write unit assembly and operation is principally equivalent to corresponding laser-based assemblies found in the prior art, in which a laser beam reads and reproduces memory signals from a disc.

Referring now to FIG. 6, the principal elements of a laser-based random access multiple read/write units architecture as per the present invention are illustrated. FIG. 6 shows a laser disc 601 having therein, in a laser readable format, sufficient recording area 611 to store a variable content program. The recording area 611 of the laser disc 601 is shown as substantially concentric tracks lying in a single plane. Alternatively, the recording area comprises a multitude of quasi-concentric tracks forming one or multiple spiral tracks. Additionally, tracks can be provided in one or more planes on each side of the laser disc, as well as on both sides of the disc.

Referring now to FIG. 6 in conjunction with FIGS. 3C and 3D, in a preferred embodiment of reading non-sequential video segments from a single video source, a first reading unit 621 is directed by the segment scheduler to retrieve video information corresponding to the desired frames 4112–5109 of a first, or current, video segment from a video source. Concurrently with the first reading unit 621 reading the information from the first segment, a second reading unit 622 is positioned, according to the program segment map and the segment scheduler, to preread within one revolution of the disc beginning frame information of a next non-sequential segment from the same video source.

In this example, the next non-sequential segment begins at frame 35351. Concurrently with the first reading unit 621 reading the current segment, the second reading unit 622 is caused to preread into a video buffer (514 FIG. 5) that portion of the next non-sequential segment beginning at frame 35351 necessary to provide a seamless transition from the first reading unit reading of the current segment ending at frame 5109 to the second reading unit reading of the next non-sequential segment beginning at frame 35351. The video buffer, thus containing the segment information necessary to provide a synchronized, seamless transition from the first segment to the second segment without any gaps in the transmission of the retrieved video segments as a continuous video program.

Concurrently with the second reading unit 622 reading the next non-sequential segment, now a current segment, the first reading unit 621 is repositioned to begin prereading of a next non-sequential segment beginning at frame 5175. By the time the second reading unit 622 completes reading the current segment at frame 38975, the first reading unit 621 has preread frame 5175. The process, analogous to a relay race, repeating itself until the last desired segment has been read.

In an interactive video game application, a multiple reading unit architecture is advantageously utilized to additionally provide faster video responses to the user/player's actions. Briefly, while a first reading unit 621 is reading a first video segment, frames 4112–5109, a second reading unit 622 is positioned to read a second segment beginning at frame 35351. The positioning of said second unit 622 being responsive to the option being presented to the player during the reading of the first segment which may require reading the second segment rather than continuing reading the first segment or reading the next sequential segment. Alternatively, the second reading unit provides overlay images in synchronization with the images retrieved by the first reading unit.

Each reading units's movement over the disc surface is over a designated radial segment such that the movement of each reading unit over the recorded radius of the disc is not impaired by the movement of a different reading unit. In this fashion, the movement of the first reading unit 621 over its radial segment 631 does not intersect the movement of the second reading unit 622 over its radial segment 632.

It is noted that the reading unit's travel need not be limited to the radial segments. A positioning system providing for the positioning of the reading unit at any point over the recording media, provides the reading unit the potential to precisely intercept the beginning of a segment/frame at a precisely defined moment. This being represented in FIG. 6 as the juncture of a radial segment 631 and the beginning of frame 5175. In this fashion the requirement of prereading into a video buffer can be reduced if not eliminated.

FIG. 6 also shows a third reading unit 623. While a simple variable content motion picture application does not require more than two reading units, the third reading unit 623 is illustrated principally to emphasize that a multiple-read architecture is not limited to two reading units 621–622, and is available for more demanding interactive variable content game applications. Further, as illustrated, a reading unit's movements over the recorded surface need not be confined to a particular quadrant, side of the surface, or radius of the surface. In the illustration the third reading unit's 623 movement over the recorded surface is permitted over the recorded diameter 633 of the surface.

Additionally or alternatively, the information is recorded on the laser disc in a manner that, either through placement or duplication of frames, anticipates the desired and possible position of a reading unit. In this case, even if the movement of the reading units are confined to radial segments, the requirement of a video buffer is for this purpose eliminated. This also being represented in FIG. 6 as the various junctures of the radial segments and the beginning of the frames.

Specifically, in this architecture, concurrently with a first reading unit 621 reading a current segment from a

5,434,678

17

single video source, a second reading unit 622 is positioned to be able to intercept and read the beginning of a next non-sequential segment, in this example frame 35351, at that instant that the first reading unit 622 completes reading the current segment at the end of frame 5109. At that the first reading unit 621 completes reading frame 5109, the second reading unit begins reading frame 35351, thereby in combination with the first reading unit causing a seamless transition from the reading of the current segment to reading of the next non-sequential segment.

In the next stage, concurrently with the second reading unit 622 reading the beginning of the next non-sequential segment at frame 35351, now a current segment, repositioning the first reading unit 621 to be able to intercept and read the beginning of a next non-sequential segment, frame 5175 at that instant that the second reading unit completes reading the current segment at frame 38975. The process continuing until all the required segments are read.

Still additionally, or alternatively, the rotational speed of the disc platter is set sufficiently high to permit the reading unit to read into buffers sufficient video information to provide the same reading unit sufficient time for repositioning and begin reading the next non-sequential segment before the video information in the buffer is exhausted. This would in certain applications eliminate the need for multiple reading units.

Specifically, in the reading of non-sequential video segments from a single video source, a single video source 601 is caused to rotate at a sufficiently high rate 641, in this example 60 frames per second or 3,600 rpm 641, i.e. twice the rate of 30 frame per second 642, to permit a reading unit 621 to both read and preread an amount of a current segment (frames 4412–5109) into a video buffer sufficient for the reading unit 621 to be repositioned to read the beginning of a next non-sequential segment, frame 35351, before the preread amount in said video buffer is exhausted. In this example, prereading frames 4498–5109 provides the reading unit 621 sufficient time to be repositioned to read a next non-sequential segment, frames 35351–38975. Concurrently with the repositioning of the reading unit, the video buffer provides the last preread frames 4498–5109 to cause a seamless transition from the reading of the current segment, frames 4112–5109, to the reading of the next non-sequential segment, frames 35351–38975. The process continuing until all the required segments are read.

In this architecture, the reading unit prereads into the buffer only in advance of a next non-sequential segment, or continually prereads into the video buffer as the video information in the buffer is depleted.

A variation of this technique particularly applicable to interactive video game applications is detailed with respect to FIG. 3E. In this example, previously summarized, a read stream comprises alternating frames from a number of different video segments. The number of different video segments resulting from the attainable effective transfer rates of the system. For example if the video application requires a transfer rate of 30 frames per second, and video compression techniques, rotational speed, and/or reading capability of the system can achieve an effective transfer rate of 120 frames per second, than four different video segments can be read "concurrently" by a single reading unit. In such an architecture, the frame arrangement comprises a reading stream 341 of alternating frames from four separate

18

segments A–D and is read at an effective rate of 120 frames per second. The processing architecture selects the desired segment A,B,C, or D from the read stream 341 to generate a transmission stream 342, at a rate of 30 frames per second, of the desired frames 351A–353A, 351B–353B, 351C–353C, or 351D–353D.

To further detail, and with respect to FIG. 6, a single video source 601 is caused to rotate at a sufficiently high rate, for example 60 frames per second 641 or 120 frames per second 643 to permit a reading unit 621 to read at multiples of the 30 frames per second rate required to transmit a single one of a plurality of video segments (A–D). Referring once more to FIG. 3E, the frames being intermittently arranged as a reading stream 341 in the video source. As the reading unit is caused to read the reading stream 341; a video processor (513 FIG. 5) extracts from the reading stream 341 a transmission stream 342 representing a single one of the plurality of video segments.

In this fashion a single reading unit can provide instantaneous shifting among a number of different segments. In an interactive video game application, shifting among a number of different video segments can be instantaneously achieved in response to a players interaction with the game's software logic.

To enhance the simulation of each video stream, a windowing technique, such as shown in the previously cited patent to Blanton et al., in which only a portion of each frame is displayed, is applied to each frame in one or more of the video streams to enhance the simulation of movement within a multi-dimensional space and to provide composite images of greater complexity.

These and other variations in the particular number and arrangement of the reading units, video buffer, and frame arrangement configuration that is implemented in a RAViT is a function of the complexity of the video/data, and cost/performance constraints. It is also intended that the teachings of the various configurations shown herein and in the cited art may be combined responsive to the particular application. Clearly, with technology continuously achieving greater storage capacity in smaller, faster, and more cost effective storage devices, there is no apparent limitation to the complexity of the variable content program that can be commercially executed.

The description above has for simplicity been detailed with respect to a reading unit. It is to be understood that a reading unit herein comprises both reading and writing capabilities operationally independent of the operation of another read/write unit in the system's architecture. Additionally, a read/write unit need not be limited to a particular current architecture, enhancements to the construction of the reading unit itself, such as for example multiple tracking mirrors/beam splitters, are contemplated to produce faster access times and transfer rates. Further, the multiple read/write architecture detailed need not be limited to a laser disc system. In an alternate embodiment, a hard disk drive is modified as per the teachings above detailed to significantly increase transfer rates and lower average access times. Clearly, at present, in a hard disk embodiment the read/write units are magnetic read/write heads.

Generally, the viewing of a variable content program is intended to be hardware independent. That is, a variety of hardware, firmware, and software architectures are possible either locally or remotely accessible by the viewer that provide the benefits of a variable content program. In particular, a random access device's read/-

5,434,678

**19**

buffer architecture, modified as per the present invention, is intended to be implemented in a variety of mass memory devices. Embodiments of the read/buffer architecture detailed herein is not intended to be limited to any particular available recording medium and recording format technologies. The teachings of the present invention are applicable to a number of random access technologies such as, for example, and not limitation, fixed and removable magnetic, optical, or photomagnetic media, and digital or analog recording formats. Any combination of existing or forthcoming media, format, and compression memory technologies may advantageously incorporate the teachings herein detailed.

In general, parts, sub-assemblies, and components of a RAViT are of conventional characteristics and are freely substituted by like functioning elements and components. For example, and not limitation, while fiber optic-based communications are preferred, copper phone lines and coaxial cable-based communications are considered, albeit less capable nonetheless, functional equivalents. Additionally, a certain degree of redundancy of components is illustrated in FIG. 5 to schematically show and detail significant functions. Clearly, redundant components in general, and redundant electronic components in particular, are intended to be eliminated in a preferred embodiment. For example, in a number of configurations a removable memory subsystem and a compact memory sub-system are both required. In a general sense, one is the functional equivalent of the other. In a preferred embodiment, for example, a removable memory sub-system is eliminated, and the compact memory sub-system performs the functions that are associated with it. In general, where cost effective, components are designed to serve a combination of functions.

Further, the configuration of RAViT's various modules, components, and sub-systems, are intended to offer flexibility analogous to that found in a personal computer. Specifically with respect to the multi-user capabilities, a RAViT may be configured, for example, with more than one laser disc module. Whether inside the primary cabinet or in a mating or sister cabinet. Responsive to user friendliness, a more advanced wireless plug and play communications and power motherboard and cabinet design is preferred. The motherboard and cabinet permitting the replacement of, for example, the power supply just as easily as a battery is replaced in a portable personal computer. In a preferred embodiment of RAViT, every component and sub-system is replaced without resorting to screwdrivers and the need to unplug and plug communications and power cables.

While an embodiment of the present invention is detailed above with respect to a random access video laser disc device physically accessible by the viewer, variations are also possible. For example, the laser disc device need not be physically located near the television set. The patent to Fenwick et al. U.S. Pat. No. 4,947,244, by reference incorporated herein, discloses remote video distribution systems such as may be found in a hotel, wherein the viewer is provided remote controlled access to video resources. Fiber optic communications easily permit the required transfer rates between a device, or any alternative memory device, and a viewer's receiver/television.

As shown by the hardware configuration detailed with respect to FIG. 5, RAViT is equally adept at retrieving full motion video from a resident program

**20**

storage device or remotely from a network-based service provider. A B-ISDN interface, an internal or external modem, or a dedicated communications line, such as for example a coaxial cable, provides RAViT communications capabilities with providers of programming and other on-line services. These other services comprising, for example, banking, security, shopping, instructional, and educational services.

With respect to video-on-demand, and video networks, the teachings of the patents to Monslow, U.S. Pat. No. 4,995,078, to Way, U.S. Pat. No. 4,891,694, and to Walter, U.S. Pat. No. 4,506,387, are by reference incorporated herein. These patents teach a variety of land line and fiber optic transmission of programs embodying varying degrees of viewer capabilities in the selection of programs. While the prior art does not teach transmission of a variable content program, a reading of said art will assist the reader interested in obtaining a more detailed disclosure of the hardware of such systems than is necessary to provide here.

FIG. 7 is a simplified schematic diagram a video program provider and subscriber network architecture as per the present invention. Participants in a B-ISDN **711**, as per the present invention, comprise any number of video program providers **700** and any number of subscribers **721**. As in a communications network, each participant is able to transfer and retrieve video/data transmissions from any other participant. Each participant obtaining a hardware configuration consistent with their desire and their financial means.

The particular configuration of each subscriber's video system's **721/722/723** storage, memory, processing, and communication capabilities is responsive to, but is not necessarily limited by, the minimum requirements of the particular service provider. A RAViT configuration, such as detailed with respect to FIG. 5, provides the required video program storage, processing, and communications architecture.

The video system of a participant who wishes to serve as a video program provider **700** is functionally equivalent to the RAViT device previously detailed, differing only in that the respective resources are appropriately scaled and modified to simultaneously access a variety of programs, and service a number of subscribers.

A video provider system **700** comprises: i) mass storage random access memory devices **701** for storing a plurality of variable content programs, and a plurality of program segment maps each defining segments of a corresponding video program; ii) communications linkages **702** to the B-ISDN for establishing communications with a plurality of participating subscriber video systems (RAViTs) **721/722/723**; iii) processing hardware/software **703** for retrieving from participating subscriber video system a subscriber's video content preferences, and for automatically selecting, for each of the participating subscribers, variable content program/program segment map, and/or segments, from a programbase, comprising a plurality of variable content programs and corresponding program segment maps, responsive to the application of the corresponding one of the subscriber's video content preferences to the programbase; iv) random access devices **704** for retrieving for each participating subscriber the corresponding selected variable content programs and/or video segments; and v) transmission architecture **705** for transmitting, to each participating subscriber video system, the corresponding retrieved selections. Simply stated,

JA 000277

21

an on-line variable content program provider provides each viewer content-on-demand.

In a preferred embodiment, in response to a subscriber 721 request of one or more variable content program(s) from a video provider 700, the entire variable content program including all the parallel, overlapping, and transitional segments is provided via the fiber optic network 711. Alternatively, the program is provided to the subscriber in the form that results from the execution of the viewer's video content preferences, i.e. a logical seamless sequence of only those segments that are consistent with the viewer preferences are transmitted in a real-time and a non real-time format over the network 711.

Where the subscriber 721 remains on-line with the video provider 700 during the transmission of the video and utilizes the hardware resources of the video provider, a RAViT comprising principally communications capabilities without significant local storage, processing, or memory, is adequate. In such an architecture the viewer preferences are retained by the video provider.

Retrieving video from a remote video provider permits subscribers to efficiently obtain from an extensive programbase a program to be viewed at the time of their choosing, over which they exercise complete control as to the subject matter, form of expression, and other elements comprising the program. Further, the resulting program need not comprise or result from a single variable content program in a programbase. A program may result from the automated selection of a variety of segments/programs from the programbase.

In a video provider, the implementation of the multiple read head architecture provides for the simultaneous retrieval of several versions of a program from a single program source to satisfy simultaneously the particular viewing requirements of several subscribers. A multiple read head architecture reduces, for example, the number of copies of a program that the on-line video provider requires. Alternatively, where cost effective, a variable content program may be entirely or partially stored in RAM.

It is also important to note that the novel combination of an external fiber optic based communications module and a multiple read/write units laser disc module, provides a RAViT configuration capable of efficiently downloading significant amounts of full motion video to be viewed, played with, or processed at the subscriber's leisure. In such a RAViT the downloading of, for example, a feature length motion picture, an interactive video game, or a series of lectures can be achieved with unprecedented speed.

The previously shown capacity to read/write the viewer preferences from/to a compact portable memory device 731 provides a viewer the means to automatically configure a RAViT that had not previously learned the viewer's video content preferences (dumb RAViT).

Referring once more to FIG. 7, in anticipation of the desire to efficiently utilize a dumb RAViT, a viewer instructs the smart RAViT 721 to download to a compact portable memory device 731 the desired viewer preferences and program request routines. To automatically configure and retrieve programming consistent with the preferences and program request routines, the viewer provides the prepared compact portable memory device 731 to the dumb RAViT 722, or to an accessory device 732 in communication with the dumb

22

RAViT 722. The compact portable memory device 731 automatically configuring the dumb RAViT without necessarily downloading the viewer preferences other than to volatile memory. The operation being similar to moving a game cartridge from a first game player to a second game player.

In this context, programming request routines automate the retrieval of desired programming from a programming services provider 700 accessible to a RAViT 722. In this fashion, for example, a travelling executive can automatically configure each days new hotel room RAViT to retrieve videophone messages, the day's news in a format and for topics preestablished by the executive, followed by a menu of recently released films that the executive has not seen. The operation being analogous to inserting an access card in a hotel room door.

Alternatively, a similar automated configuration is performed by means of line-based external communications capabilities 711 available to both the dumb RAViT 722 and the smart RAViT 721.

As indicated with respect to FIG. 5, and represented in FIG. 7, multi-user and multi-services modules support separate controlled independent access by other users of RAViT's processing, video, and communications resources. In addition to the primary video display system 741 supported by RAViT 721, the multi-user module and multi-services module installed in this example support a separate monitor/keyboard 742 access to RAViT's 721 resources, and cooperatively supports the operation of a security system 743.

Before proceeding with a detailed description of the steps of utilizing a variable content video disc on RAViT, it is important to appreciate that in general following the initial setup of RAViT with a viewer preferences, a subsequent viewing of a variable content program conforming to the standard structure only requires the pressing of a play key. Following the pressing of the play key, RAViT automatically initiates playing of the video program without the necessity of any further viewer interaction or instructions. In other words, in a standardized descriptive structure architecture, once RAViT initially learns the viewer's preferences, it does not require any more of the viewer than, for example, a conventional laser disc player. Similarly in the playing of an interactive variable content game, once RAViT initially learns the viewer/player preferences, the gaming interaction proceeds transparently of the video editing functions. It is intended that a single viewer preferences serve both gaming and viewing applications. Optionally, the viewer may establish separate viewing preferences for each of the classes (e.g. gaming, viewing, computing) of video programs.

The steps comprising the method of viewing a variable content program on a RAViT are detailed with respect to the flow-chart of FIGS. 8A, 8B, and 8C. Beginning at step 801, the viewer selects and retrieves the desired program consistent with the architecture of the particular RAViT hardware implementation. Upon selection of the play function 802, RAViT's software, firmware, and hardware processing capabilities ("processor") issue a command to read the viewer control setup to ascertain if viewer control is enabled 803. If enabled, RAViT's handshaking routines request viewer identification and, if required, a corresponding password 804. If the viewer identification and password are not found acceptable 805, the appropriate error message

5,434,678

23

is transmitted to the television 806, and RAViT is returned to a state prior to the viewer play request 802.

If viewer identification and password are found acceptable 805, the processor checks for other restrictions to a user access 807. These additional restrictions include: time of day restrictions for the user, and/or accumulated usage during specified time frames. If restrictions are enabled that prevent usage 807, an appropriate error message 809 is transmitted to the television, and RAViT is returned to a state prior to the viewer play request 802. The user-permission capability enables a parent to have complete control over the use of RAViT, and provides for multiple individualized preferences.

If viewer control is not enabled 803, or if enabled, verification of the user 805 and verification of restrictions permit usage 807, program setup routines are initiated. Referring now to FIG. 8B, program setup routines 811 include reading, from the program source, program identification information. Based on the program identification information, which in addition to including a unique identification code also contains qualitative and classification program information, setup routines search to see if a corresponding viewer preferences/table for the identified program is available 812. Otherwise, the program category descriptive structures 813 are obtained from the program source to determine if a viewer preference is established for each of the program categories.

Once viewer preferences are established, the processor verifies set up status for editing privileges 814, to determine if the viewer has editing privileges for the class of programs to which the present program belongs and the categories included therein. The processor at this point transmits to the television a request for the viewer to indicate if the existing preferences are to be edited 815. If at step 814 edit privileges are not available for the viewer, the processor initiates normal play routines. If the viewer indicates that no editing privileges are to be exercised 815, normal play routines are initiated as well; otherwise, editing of the viewer preferences occurs at step 818.

The edited viewer prefereices are interactively verified 819 until an adequate category preference match, as required by the program and the user is established, or the viewer selects to exit. Exiting at 819 returns RAViT to a state prior to the viewer play request 802.

If a viewer preferences for the login viewer for the selected program is not available 812, or at least one of the categories of the program is not contained in the viewer preferences 813, then the processor verifies if edit privileges are available for the viewer for the class of programs and the categories 816. If no edit privileges are available, an exit message 817 is transmitted to the television, and RAViT is returned to a state prior to the viewer play request 802. If edit privileges are available 816, then editing of the viewer preferences 818 is initiated.

Editing the viewer preferences 818 is supervised to insure that viewer modifications are consistent with the permissions established for that viewer. Individual viewer permissions are established broadly for any one or more classes of programs or categories, or specifically for any category. Once editing of the preferences is found complete 819, as required by the program category listing, play routines are initiated.

Referring now to FIG. 8C, following the enabling of the play routines 821, the program segment map is read

24

822 from the program segment map storage media or memory. As previously detailed, the program segment map defining the sequential and non-sequential segments of the selected program. At this point, RAViT's processing capabilities retrieve and apply the viewer's preferences, stored in a memory or a storage device, to the program segment map 823. The application of the viewer's preferences to the program segment map results in the automated logical selection of sequential and non-sequential segments of the selected video program 824 consistent with the viewer's video content preferences and the program segment map. Once the segments to be played and their sequence are determined 824, the random access retrieval and transmission capabilities of RAViT automatically retrieve the selected sequential and non-sequential video segments stored in the video program storage device, and transmit the video segments as a seamless, continuous video program 825.

In an interactive video game, the start and setup routines detailed with respect to FIGS. 8A, and 8B are integrated with each games setup routines.

As suggested previously, the capabilities of RAViT are particularly well suited to providing an editor (i.e. parent) complete control as to the video material to which a viewer/player (i.e. child) is exposed. As indicated above, AViT provides: user, time of day, amount of viewing controls; and individual preferences for each viewer/player or class of viewers/players. Additionally, supplementing or alternative routines are provided which are preferable in those instances where: i) segments cannot be rated according to standardized descriptive structures; ii) the utilization of a descriptive structure system is not desired; or iii) a simpler routine provides the desired functionality.

Specifically, the present invention permits an editor to automatically select segments of a video program previously identified in a program segment map as providing material which may not be suitable for a viewer; viewing the selected segments and determining their suitability for viewing by the viewer; automatically generating a listing of segments responsive to the segment suitability determination applied to the program segment map; automatically retrieving the listed segments; and automatically transmitting the retrieved segments as a continuous video program for said viewer. Segments not suitable for a viewer may be defined as segments providing content and form of expression which, in a conventional sense, is deserving of a rating other than a MPAA "G" rating.

Alternatively to, or in addition to the editing system based on the application of descriptive structures, a simplified editing system is based on the "flagging" of segments irrespective of the specific nature of the material which may not be suitable for a viewer. That is all segments containing material not suitable receives the same flag or code. The flagging of segments provides an efficient method of coding and retrieving the segments and indicating their inclusion/exclusion in a program/-game to be viewed/played.

An example of the editing routines that provide for the efficient previewing of flagged segments are summarized with respect to FIG. 9. One of a number of RAViT setup routines present a listing of viewers over which the editor has editorial control. With respect to each viewer and the selected program, the listing indicates if a segment table is already available 901, and if viewer preferences are available 902 or not 903. Addi-

tionally the option to designate a new viewer 904 is made available to the editor.

If a corresponding table for the desired viewer is available 901 and the editor does not wish to make any changes, than selecting this option exits the routine, the operation of RAViT is then permitted as detailed previously. If a corresponding table for the selected viewer is not available, and the editor does not wish to create or update the viewer's preferences 902, than the routine proceeds by reading the program segment map 921. If the editor wishes to modify or create viewer preferences 903, than the routine proceeds with the appropriate routines 912. If the editor indicates the entry of a new viewer 904, the appropriate viewer entry routines are enabled 909, and the opportunity to create viewer preferences for the new viewer is provided 911.

The routines to update/create new preferences 912 permit both a program specific or permanent updating of the selected viewer's preferences. Once viewer preferences are indicated, if any, the selected program's segment map is read 921 and compared to the preferences 922 to the extent that they are available.

If all the flagged segments are effectively excluded by the viewer preferences 922, than the resulting program segment table is saved 941 and the routine is exited. Otherwise, in addition to an initial segment table, a list is prepared 923 consisting of any flagged segments that have a descriptive level lower than the corresponding level in the preferences, and flagged segments for which there is no corresponding preferences. In the absence of viewer preferences every flagged segment is included in the segment list.

In a manner similar to the retrieval of non-sequential segments outlined previously, only the segments in the segment list are shown one after the other 931 as a continuous stream to the editor, pausing only if an include/exclude decision is not indicated 932. The process continuing automatically 934 until a decision on each of the flagged segments in the list is made 932. As each decision is made the segment table is updated 933. Alternatively, the segment table is updated and saved following the transmission of the last segment 941.

Each segment need not be viewed in its entirety 931, as soon as an include decision is made 932, the showing of the next segment begins instantaneously. Additionally, it should be understood that a showing of a flagged segment is not limited to, or indicate, the actual transmission of the flagged segment's video/sound. Appreciating that certain adults may not be interested in viewing the flagged segments, a character description of the contents of the segment may be provided instead or in advance of the option to view the corresponding segment.

The above is presented to emphasize the control features and capabilities of the present invention, the particular routines shown can be enhanced in a number of ways. Configuration routines are contemplated that further facilitate and automate viewer/player controls.

For example, a configuration can be selected that automatically creates for selected or new viewers/players a segment table excluding all flagged segments. In this case at system setup a viewer is simply associated with the exclusion of all flagged segments.

Similarly, additionally, or alternatively, a viewer/player is associated with a descriptor code paralleling the MPAA rating system as previously detailed with respect to FIG. 2D. At system setup a viewer/player is associated with an appropriate rating code, thereafter,

the viewing/playing of a program is consistent with the rating code associated with the respective viewer. The simplicity of the architecture in combination with the teachings of the variable content program permits, for example, by means of a single code associated with each viewer, a parent to view an "R" version of a film, and permits a child to view a "G" version of the same film. It is noted that this architecture provides more tailored control than the simpler exclude all flagged segments architecture, but significantly less tailored control than a category specific video content preferences. In a preferred embodiment, the various structures detailed above are correlated to permit the application of a variety of content control options without requiring duplicating descriptor definition. For example a assigning a segment a descriptor other than "G" rating is equivalent to flagging the segment.

Clearly, a number of other interactive capabilities are made possible by the architecture of RAViT. For example during the viewing of a program, skip keys cause the automatic skipping of the present segment and the instantaneous viewing of the next logical segment. Other functions permit interactive modification of the segment map, such as flagging a segment, as the program is being viewed. It is intended that a number of other interactive capabilities be implemented which incorporate the teachings of prior art interactive and multimedia system. Specifically in this respect, the teachings of the patent to Bohrman, previously cited, are by reference incorporated herein.

Since the prior art is well established, and many of the features, components, and methods, found therein may be incorporated in the preferred embodiment; and since other modifications and changes varied to fit particular operating requirements and environments will be apparent to those skilled in the art, the invention is not limited to the presently preferred form of the present invention set forth here and above, it is to be understood that the invention is not limited thereby. It is also to be understood that the specific details shown are merely illustrative and that the invention may be carried out in other ways without departing from the spirit and scope of the following claims.

What is claimed is:

1. A video system comprising:

preferencing means for establishing video content preferences responsive to at least one content category of possibly unsuitable content, said at least one content category including a violence category;

memory means for storing a video segment map and a video, said video segment map defining a plurality of video segments of said video responsive to said at least one content category;

processing means for automatically selecting video segments from said plurality of video segments responsive to an application of said video content preferences to said video segment map;

random accessing means for retrieving the selected video segments; and

transmitting means for transmitting the retrieved video segments as a continuous video.

2. The video system of claim 1, wherein said plurality of video segments comprises at least one non-sequential video segment selected from the group consisting of a parallel video segment, a transitional video segment, and an overlapping video segment.

5,434,678

27

3. The video system of claim 1, wherein said random accessing means further comprises seamless accessing means for seamlessly retrieving the selected video segments.

4. A video system comprising:

preferencing means for establishing video content preferences responsive to at least one content category of possibly unsuitable content, said at least one content category including a violence category;

first memory means for storing a video segment map defining, a plurality of video segments of a video responsive to said at least one content category;

second memory means for storing said video;

processing means for automatically selecting video segments from said plurality of video segments responsive to an application of said video content preferences to said video segment map;

random accessing means for retrieving the selected video segments; and

transmitting means for transmitting the retrieved video segments as a continuous video.

5. A video system comprising:

preferencing means for establishing video content preferences responsive to a preestablished segment descriptive structure including a violence content category;

memory means for storing a video, said video comprising a plurality of video segments and a video segment map, said video segment map defining said plurality of video segments responsive to said preestablished segment descriptive structure;

processing means for automatically selecting video segments from said plurality of video segments responsive to an application of said video content preferences to said video segment map;

random accessing means for seamlessly retrieving the selected video segments; and

transmitting means for transmitting the retrieved video segments as a seamless video.

6. The video system of claim 5, wherein said plurality of video segments comprises at least one non-sequential video segment selected from the group consisting of a parallel video segment, a transitional video segment, and an overlapping video segment.

7. A video system comprising:

preferencing means for establishing video content preferences responsive to at least one content category of possibly unsuitable content, said at least one content category including a violence category;

memory means for storing a video, said video comprising a plurality of video segments and a video segment map, said video segment map defining said plurality of video segments responsive to said at least one content category, said plurality of video segments comprising at least one non-sequential video segment selected from the group consisting of a parallel video segment, a transitional video segment, and an overlapping video segment;

processing means for automatically selecting video segments from said plurality of video segments responsive to an application of said video content preferences to said video segment map;

random accessing means for seamlessly retrieving the selected video segments; and

transmitting means for transmitting the retrieved video segments as a seamless video.

28

8. A video system comprising:

preferencing means for establishing video content preferences responsive to at least one content category of possibly unsuitable content, said at least one content category including a violence category;

processing means for automatically selecting video segments from a plurality of video segments of a video responsive to an application of said video content preferences to a video segment map of said video, said video segment map defining said plurality of video segments;

random accessing means for retrieving said video segment map and for seamlessly retrieving the selected video segments from a memory means storing said video segment map and said video; and

transmitting means for transmitting the retrieved video segments as a seamless video.

9. The video system of claim 8, wherein said memory means for storing said video segment map and said video comprises a first memory means for storing said video segment map, and a second memory means for storing said video.

10. A video system comprising:

preferencing means for establishing video content preferences responsive to at least one content category of possibly unsuitable content, said at least one content category including a violence category;

processing means for automatically selecting video segments from a plurality of video segments of a video responsive to an application of said video content preferences to a video segment map of said video, said plurality of video segments comprising at least one non-sequential video segment selected from the group consisting of a parallel video segment, a transitional video segment, and an overlapping video segment, said video segment map defining said plurality of video segments;

random accessing means for retrieving said video segment map and for seamlessly retrieving the selected video segments from a memory means storing said video segment map and said video; and

transmitting means for transmitting the retrieved video segments as a seamless video.

11. A video system comprising:

preferencing means for establishing video content preferences responsive to at least one content category of possibly unsuitable content, said at least one content category including a violence category;

processing means for automatically selecting video segments from a plurality of video segments of a video responsive to an application of said video content preferences to a video segment map provided by said video, said video segment map defining said plurality of video segments;

random accessing means for retrieving said video segment map and for seamlessly retrieving the selected video segments from a laser readable means storing and transporting said video segment map and said video; and

transmitting means for transmitting the retrieved video segments as a seamless video.

12. The video system of claim 11, wherein said plurality of video segments comprises at least one non-sequential video segment selected from the group consisting of

5,434,678

29       30

a parallel video segment, a transitional video segment, and an overlapping video segment.

**13.** A video system comprising:

preferencing means for establishing video content preferences responsive to at least one content category of possibly unsuitable content, said at least one content category including a violence category;

processing means for automatically selecting video segments from a plurality of video segments of a video responsive to an application of said video content preferences to a video segment map of said video, said video segment map defining said plurality of video segments responsive to said at least one content category;

random accessing means for retrieving said video segment map and for retrieving the selected video segments from a memory means storing said video segment map and said video; and

transmitting means for transmitting the retrieved video segments as a continuous video.

**14.** The video system of claim 13, wherein said random accessing means further comprises seamless accessing means for seamlessly retrieving the selected video segments.

**15.** A video system comprising:

preferencing means for establishing video content preferences responsive to at least one content category of possibly unsuitable content, said at least one content category including a violence category;

processing means for automatically selecting video segments from a plurality of video segments of a video responsive to an application of said video content preferences to a video segment map of said video, said video segment map defining said plurality of video segments responsive to said at least one content category, said plurality of video segments comprising at least one non-sequential video segment selected from the group consisting of a parallel video segment, a transitional video segment, and an overlapping video segment;

random accessing means for retrieving said video segment map and for seamlessly retrieving the selected video segments from a memory means storing said video segment map and said video; and

transmitting means for transmitting the retrieved video segments as a seamless video.

**16.** A video system comprising:

preferencing means for establishing video content preferences responsive to a preestablished segment descriptive structure including a violence category;

processing means for automatically selecting video segments from a plurality of video segments of a video responsive to an application of said video content preferences to a video segment map of said video, said video segment map defining said plurality of video segments responsive to said preestablished segment descriptive structure;

random accessing means for retrieving said video segment map from a first memory means storing said video segment map, and for seamlessly retrieving the selected video segments from a second memory means storing said video; and

transmitting means for transmitting the retrieved video segments as a seamless video.

**17.** The video system of claim 16, wherein said plurality of video segments comprises at least one non-sequential video segment selected from the group consisting of a parallel video segment, a transitional video segment, and an overlapping video segment.

**18.** A method of editing a video comprising the steps of:

establishing video content preferences responsive to at least one content category of possibly unsuitable content, said at least one content category including a violence category;

retrieving a video segment map defining a plurality of video segments of said video, said video segment map responsive to said at least one content category;

automatically selecting video segments from said plurality of video segments responsive to an application of said video content preferences to said video segment map;

retrieving the selected video segments; and

transmitting the retrieved video segments as a continuous video.

**19.** A method of editing a video comprising the steps of:

establishing video content preferences, said video content preferences responsive to a preestablished segment descriptive structure including a violence category;

retrieving a video segment map defining a plurality of video segments of said video, said video segment map responsive to said preestablished segment descriptive structure, said plurality of video segments comprising at least one non-sequential video segment selected from the group consisting of a parallel video segment, a transitional video segment, and an overlapping video segment;

automatically selecting video segments from said plurality of video segments responsive to an application of said video content preferences to said video segment map;

seamlessly retrieving the selected video segments; and

transmitting the retrieved video segments as a seamless video.

* * * * *

JA 000282

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by CAREY RODRIGUEZ GREENBERG O'KEEFE, LLP, Attorneys for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On **July 29, 2013**, Counsel for Plaintiff-Appellant has authorized me to electronically file the foregoing **Brief for Plaintiff-Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

ERIC BRIAN STORM
THE STORM LAW FIRM, PLLC
11701 Bee Caves Road
Suite  221
Austin, TX 78738
(512) 505-2331
eric.storm@thestormlawfirm.com

*Counsel for Defendants-Appellees.*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

July 29, 2013                                          /s/ Robyn Cocho
                                                              Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains 12,857 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X   The brief has been prepared in a proportionally spaced typeface using MS Word 2002 in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using _____ _____ in a ___ characters per inch_____ font.

July 29, 2013                    /s/ John C. Carey_____
Date                                    John C. Carey
                                        *Counsel for Plaintiff-Appellant*